FOURNET, Justice.
 

 The plaintiff, Ludwig Doucet, filed this suit in tort to recover $10,650 in damages from The Texas Company in solido with Shelly Pellegrin, in charge of the company’s oil operations in Lake Pelto, for the value of oysters allegedly killed during the 1932-1933 season in the beds leased by the plaintiff from the state as the result of the company’s pollution of the waters of this lake and surrounding bodies of water— Terrebonne Bay, Lake Barre, Timbalier Bay, and Bay Sainte Elaine — by its negligence in discharging into these waters during the course of its oil operations in Lake Barre and Lake Pelto large quantities of oil, waste, refuse, salt water waste, and poisonous gases.
 

 The defendants filed an exception of misjoinder of parties defendant and of actions, and also exceptions of no cause and no right of action, all of which were overruled. The company, then answering, denied generally all of the allegations of the plaintiff’s petition, averring that it was operating under a state lease and that its operations were conducted under the best conditions, in accordance with approved practices and methods. The defendant Pellegrin admitted he was employed by The Texas Company and in charge of the Lake Pelto oil well, but he denied any and all liability.
 

 There was judgment in the lower court rejecting plaintiff’s demands and dismissing his suit and he is appealing from that judgment. The defendants have answered the appeal asking that the judgment of the trial judge overruling their exceptions be reversed and that his judgment on the merits be affirmed, but they have apparently abandoned the exceptions of misjoinder of parties defendant and of
 
 *315
 
 actions, for they have failed to present either a written or an oral argument in support thereof. In any- event, they are without merit.
 

 The exceptions of no cause and no right of action are based on counsels’ contention that the plaintiff did not possess any right ■or ownership in the oysters at the time of ■their death and could not, therefore, recover damages for their value. It is their .alternative contention that the injury complained of is “damnum absque injuria,” for the defendant company conducted its operations in an arm of the Gulf of Mexico under and in accordance with a mineral lease from the state executed under the provisions of Act No. 30 of the Extra Session of 1915 and that all but one of plaintiff’s oyster leases had been granted him under statutes expressly reserving to the state the right to grant such mineral leases.
 

 The plaintiff’s oyster operations were conducted in Lake Pelto under several leases from the state, the earliest of which, dated December 4, 1925, was granted under the provisions of Act No. 54 of 1914, as amended by Act No. 139 of 1924. All of the other leases were executed subsequent to March of 1928, under the provisions of Act No. 258 of 1926. It is true that in the 1914 act, as amended, and in the 1926 act, it is declared that “all beds and bottoms of rivers, bayous, lagoons, lakes, bays and sounds and inlets bordering on, or connecting with the Gulf of Mexico,” are the property of the state to the low water mark, “including all natural oyster reefs and all oysters and all other shell fish growing thereon,” but in ' both of these acts is also contained the provision that the Department of Conservation may lease the use of such bottoms and reefs for the purpose of fishing, bedding, and raising oysters and other shell fish, subject to the restrictions imposed by law and the regulations of the commission, consequently, the plaintiff had a valuable property right in these oyster beds, for the loss of which he can recover against the one by whose fault the loss was incurred. Moreover, in the former act, the ownership of the oysters is specifically declared to be in the lessee and although the word “ownership” is omitted from a similar provision in the 1926 act, the import is the same, for in Section 8 of that act we find the provision that the failure of the tenant to pay the rental due thereon shall “ipso facto * * * terminate and cancel said lease and
 
 forfeit to the Department of Conservation of Louisiana, all
 
 the works, improvements, betterments and
 
 oysters on said leased water bottowis.”
 
 We think, therefore, that the plaintiff’s petition does state a right of action. (Italics ours.)
 

 The alternative contention of the defendants in support of their exceptions is equally without merit. While it is true that the 1926 statute does expressly reserve to the state the right to lease for mineral purposes the beds and bottoms of the waters and streams bordering on, or connecting with, the Gulf of Mexico, a careful study of Section 1 of Act No. 258 of 1926 will disclose that it was the legislature’s intention to thereby permit the state to grant mineral leases in such beds and bottoms without the necessity of se
 
 *317
 
 curing the consent of the persons to whom oyster leases were granted. It was.never the legislature's intention to give to the mineral lessees the right to operate or conduct their operations in such a manner as to pollute the waters over these beds and bottoms in utter disregard of the rights of the oyster lessees.
 

 On the merits, it is the contention of the defendants that the plaintiff has failed to discharge the burden resting with him to prove that the alleged deleterious substances discharged by them into the. waters was of sufficient quantity and such a toxic or poisonous nature that it was harmful to the life of the oyster or that the substance did, in fact, actually cause the damage complained of.
 

 The record in this case is very voluminous, comprising 19 volumes and consisting of 4,577 pages, 3,533 of which are testimony and 862 of which contain exhibits. The case was filed on October 13, 1933, and was argued here on October 7, 1943, thus covering a period of some ten years. The trial was not actually begun until some two years after the suit was filed, or on October, 1, 1935, and, after continuations from time to time,-was finally completed on March 28, 1939, the judgment of the court being rendered on October 15, 1942, some two and a half years thereafter. Counsel for plaintiff and defendant have elaborately briefed their respective views, discussing exhaustively and in detail their versions of the case, no doubt with the view of assisting the court, but notwithstanding this, we find the opinions expressed in these briefs to be very conflicting, necessitating, on our part, a careful analysis of all of the evidence in the case, particularly that of the experts.
 

 After reviewing all of this mass of testimony and exhibits, we find no difficulty in arriving at the conclusion that the defendant Texas Company did discharge thousands of barrels of bleed water (a substratal water of high salt content through its proximity to underlying salt domes that is separated from the oil upon its arrival at the surface and discarded, referred to scientifically as oil well brines) daily into the waters surrounding their producing wells, permitted the escape of poisonous gases, and negligently dispersed such a large quantity of crude oil around their operations that it spread in a film-like covering over these waters for miles and, shifting with winds and carried by tides, and currents, eventually reaching the oyster beds located in the coves and similar inlets near or against the shores, and remaining accumulated and hemmed in over these beds in appreciable quantities.
 

 All of the witnesses for the plaintiff who were ever in the vicinity of these waters and his oyster beds stated they repeatedly saw evidences of large quantities of oil on the waters and over these beds, particularly when the wind was blowing north and north-east. The defendants attempted to minimize the amount of oil discharged by them, but finally conceded that on four specific occasions some 450 barrels of oil were negligently lost and allowed to enter the water by them, i. e., 300 barrels during May of 1930, 50 barrels in June of the same year, 50 barrels in April of 1931 when the pumpers overran the tanks, and the
 
 *319
 
 last 50 in the early part of 1932 when a valve was cut.
 

 Their protestations notwithstanding, we find that the defendants’ own witnesses, as well as disinterested persons, corroborated the evidence introduced by the plaintiff to show that, if oil is harmful to oyster life, sufficient quantities of it were discharged from the operations of the defendant company in the vicinity of these oyster beds to have caused the damage complained of and it is our opinion that the plaintiff has carried his burden of proof in this 'instance by a preponderance of the evidence.
 

 For example, Mr. A. B. Patterson, an employee of The Texas Company and one of the witnesses for the defendants, after testifying about the definite and specific losses of oil reported to him, such as 200 to 300 barrels when a tank ran over and 50 barrels from a stock tank, said:
 
 “Speaking generally I seen oil on the water, oil of some kind, almost every day of my travels. *
 
 * * I took very few trips upon which I did not see oil spots or oil glaze on the waters of Terrebonne Bay.” When asked what caused the loss of the oil in 1930 and 1931, he said: “Both
 
 losses
 
 just
 
 due to negligence
 
 on the part of the pumper or gauger.” (Italics ours.)
 

 Another employee of the company and witness for the defendants was Gus Trotter. He testified that considerable oil had been lost, as previously explained, and, in addition, that considerable leaks developed in the pipes. He first admitted to 11 or 12 such leaks, then, under cross-examination, to 20, and finally increased it to 25.
 

 Still another of defendants’ witnesses, Albert Dupont, testified that in the fall of 1932, about a year prior to the filing of this suit and at about the time the plaintiff’s oysters began dying, he had seen oil in Lake Barre that appeared to cover the whole lake, and, answering the question as to' whether there was any question about that, said: “No, I was afraid my boat would catch on fire.
 
 I thought the whole lake might catch fire.”
 
 (Italics ours.)
 

 Still other witnesses of the defendant testified that whenever the pipes were disconnected oil was allowed to escape into the waters surrounding them, as well as whenever the decks were washed.
 

 Mr. James N. McConnell, in charge of the oyster division of the Department of Conservation, stated that he had noticed oil spread over these waters on numerous occasions and always on calm days, when •its appearance was not obliterated by the action of the waves. He stated further: “On one occasion I noticed a very large amount of oil in the vicinity of Jacques St. Pierre’s bedding grounds at Pass Raquet, so much so, that in a distance of two or-three thousand feet, approximately, along the shore line, you had no trouble to take a coffee cup and dip oil up off the water, approximately from the shore among the mangoes out to about five feet.”
 

 C. L. Clay, chemist of the State Board of Health who visited the region after the oyster mortality was reported, testified: “It appeared that oil was being wasted in that area; we saw evidence of oil on the water and we also on that trip saw some gas leaks where the gas was bubbling up through the water,” concluding that it “would be very difficult to state as to how
 
 *321
 
 much oil was spread out there,” but that he saw “quite a lot of it quite a distance from Lake Barre wells spread over Lake Barre and through the passes there,” that he also saw oil in or about Lake Pelto but not as much as in the Lake Barre area.
 

 Innumerable witnesses testified that oysters tonged from beds under oil covered water had a decidedly oily taste. All of the experts who visited the vicinity during the course of the experiments conducted by them corroborated this testimony, stating positively that oysters in beds under water filmed with oil for any appreciable length of time tasted of oil.
 

 The plaintiff’s testimony with respect to his planting of oysters in the beds leased by him from the state and their value, as well as their mortality, remains uncontradicted, thus leaving for our only determination the question of whether oil is toxic to oysters and did, in fact, kill the oysters in the plaintiff’s beds. Our conclusions in these respects must be based largely, if not entirely, upon the testimony of the experts who appeared both for the plaintiff and the defendants.
 

 According to the testimony in the record, the plaintiff first noticed that his oysters were dying about October 15, 1932, and, between December 15 of that year and January 10 of 1933, all of them died. He reported the matter of their mortality to Mr. James N. McConnell, director of the oyster division of the Louisiana Department of Conservation, around January 4, 1933, and Mr. McConnell visited the ' area, inspecting a number of the oyster beds, including those of the plaintiff. Upon his return, Mr. McConnell took the matter up with Dr. James Nelson Gowanloch, the chief biologist of the department, who made a trip to the vicinity around January 23. There, assisted by employees of the State Board of Health, he checked the conditions, analyzing the water and the mud in the bed bottoms and examining the oysters from the several beds in the area. He found the conditions to be alarming, with all of the oysters either dead or in a poor condition. He made another trip to the area with a chemist and analyst of the State Board of Health in March following, making further analyses of the water. Together these experts arrived at the conclusion that hydrogen sulphine in the quantity found in the water during these tests was harmful to oyster life, their findings being based on a treatise on the subject written by Dr. Herbert Francis Pryterch, biologist and director of the biological station of the United States Bureau of Fisheries at Beaufort, North Carolina, and released by the bureau during the course of Pryterch’s experiments relative to mortality of oysters off the coast of Virginia. The wells of the defendant company had been ordered closed by officials of the conservation department visiting in the vicinity on February 6, but they were reopened on February 14 after a hearing before the commission. From the time of their reopening the employees of the company ceased discharging into the surrounding bodies of water the deleterious matter and effluent waters formerly so disposed of, these being, instead, chlorinated at the well to reduce the hydrogen sulphide content or otherwise controlled. The
 
 *323
 
 theory upon which Dr. Gowanloch and his associates had based their conclusions that the oyster mortality was due to the presence of hydrogen sulphide in the water was later abandoned when Pryterch, after completing his experiments, stated he had found the cause of the oyster mortality in Virginia to be due to a lack of oxygen in the water and not to the presence of hydrogen sulphide.
 

 Dr. Gowanloch returned to the region in May of 1933, where he was met by Dr. Pryterch (the author of the treatise on oyster mortality in Virginia just referred to), who had been sent to the area to investigate the mortality of the oysters by the United States Bureau of Fisheries at the request of the Commissioner of Conservation. In cooperation with The Texas Company and its experts, Drs. Gowanloch and Pryterch covered the entire area and, according to Gowanloch, found that where the oyster mortality was the greatest, its natural enemies, such as conks, boring sponges or clams, were not present in any great numbers, or more than would be encountered under ordinary conditions. In fact, they found that in some places, where the mortality was comparatively small, these natural enemies were present in greater numbers than in areas where the greater percentage of mortality existed, while great numbers of dead oysters were not even infected by these parasites.
 

 Having concluded that hydrogen sulphide and the natural enemies of the oyster were not the cause for existing conditions, these scientists and experts tested and found that the oyster beds were in good condition and that the water contained the correct amount of salinity most conducive to the production of oysters under ordinary circumstances, their deduction being that the presence of the oil and other matters discharged into the waters of the lake by the defendant company must have some causal effect on the mortality of the oysters since all other harmful conditions had been eliminated.
 

 Accordingly, Dr. Gowanloch, who appeared as an expert witness on behalf of the plaintiff, began experiments of his own to ascertain what effect sea water, when mixed with oil and the refuse matter discharged from the oil wells, would have on the life of the oyster. He made a series of tests of experiments between June 15 and September 21 of 1933 in the waters at the site of the trouble, including the area over the beds of the plaintiff, using A-l oysters taken from areas outside the polluted region. These experiments, while unsatisfactory because of imperfect apparatus, did show, according to Dr. Gowanloch’s testimony, that the mortality of the oysters in the plaintiff’s beds, as compared with those taken from outside the polluted area, was much greater, and that while some of them remained alive, they were in anything but a healthy condition.
 

 About the time that these experiments were concluded, Pryterch made his second trip to the area, where a more extensive survey was made. Following this survey, Pryterch returned to the biological station at Beaufort and continued experimentaof his own, while Dr. Gowanloch conduct
 
 *325
 
 ed more satisfactory and extensive experiments here under instructions from the Commissioner of Conservation, who had made available sufficient money to construct a marine laboratory at the department’s Port of Entry at Grand Pass. This equipment consisted of the construction of four large tanks, into each of which, through the means of an electrically propelled circulatory water system, approximately five hundred cubic centimeters of water was pumped every minute, the exact action of wind and waves on a body of water similar to the one under study being duplicated as nearly as possible. Fifty oysters were placed in each of these tanks, the first, or control tank, consisting entirely of sea water, the second of sea water that had been pumped through a film of oil (this oil remained unchanged, only being added to as the water carried particles of it into the tanks in passing through), the third of water that had been brought into contact with sludge from the tanks at the defendant’s oil wells, and the fourth of sea water stirred with bleed water from the Lake Barre operations in the proportion of one part of bleed water to a thousand parts of sea water.
 

 The first series of experiments, begun around October 20, 1933, was a complete failure, due to the almost immediate death of the oysters in the control tank through the action of the sea water coming into contact with the metal surfaces of the circulating water system. This matter was remedied by dismantling the system and lining it with asphaltum.
 

 The second series of experiments was carried out successfully and, at the end of three months (but before the completion of the experiment, which was not concluded until some time in the early part of March), it was found that only one of the fifty oysters in the control tank had died, while in the tank consisting of the sea water pumped through an oil film, 17 were dead and the remaining 32 living oysters were getting progressively more watery and their shell formation on the inside next to the oyster “showed a peculiar blister like structure which would not normally be present.” Upon the completion of this series of experiments around March 10, it was found that 83% of the oysters in the control tank were alive, with a mortality of 17%; in the tank subjected to the oil film flow, all of the oysters were dead, or a mortality of 100%; in the tank subjected to the sludge 72% of the oysters were alive with a 28% mortality. Dr. Gowanloch explained that in the tank where the 100% mortality occurred, the oil used was very small and never changed, only being added to maintain an even content, the apparatus being so arranged that in eleven days the amount of water involved was, 316,800 times greater than the amount of oil. He also testified that the oil taken into the tank by means of the water -passing through it was deposited by adhesion to the silt particles in the tank and could be recovered from the bottom of the tank in the mud, it being plainly perceptible under a miscroscope and obvious through smell and touch.
 

 From March 10, 1934, to May 9, Dr. Gowanloch conducted a third or intermediate series of experiments with the result that out of 52 oysters in the control
 
 *327
 
 tank, only 1 died, while in the tank subjected to the oil out of 52 oysters only 3 remained alive and only 6 out of 52 oysters survived in the tank contaminated by the sludge.
 

 His last series of experiments, begun on July 9 and continued for only 22 days, showed that, because of the heat of the summer, almost as many oysters died in this short period as had during the longer periods of experimentation in cooler weather. He found the oysters remaining in the control tank to be in “fairly good shape” comparing “exactly with the oysters from the same area outside” while the few oysters remaining alive in the other experimental tanks were progressively dying.
 

 As a result o.f all of these experiments Dr. Gowanloch arrived at two very definite conclusions: (1) “that oysters will die if subjected for a sufficient length of time to” oil, it having the effect of preventing the oysters from securing sufficient food and virtually starving them to death; and (2) that “the probable cause [of the oyster mortality] is quite surely that it was the oil that caused the damage.” (Brackets ours.)
 

 After Dr. Pryterch made his report on the preliminary surveys conducted by him in the vicinity of the plaintiff’s oyster beds to Dr. Paul S. Golstoff, a world renowned biologist and expert on oysters who was his superior in the United States Bureau of Fisheries and in charge of all oyster investigations of that bureau, Dr. Golstoff was convinced that it would take time as well as money to conduct a survey and study of the conditions surrounding the mortality of the oysters in an effort to discover what effect oil had on oyster life. He therefore secured an appropriation of $42,000 with the assistance of the bureau and sent Robert O. Smith, a marine biologist who had been his assistant for several years and was thoroughly familiar with the methods of survey and experimental studies of oysters, to succeed Pryterch, with the view of making a complete survey of the hydrographic conditions in the vicinity as a part of the ground work for the establishment of a laboratory in the area. When the preliminary hydrographic survey had been completed, Dr. Golstoff joined Smith in March of 1934 and planned a series of experiments to ascertain the effect of oil on the oyster and on its food. He also helped Smith to organize the field work. Dr. Golstoff, testifying as another of the plaintiff’s experts, stated that during the course of his trips in the vicinity he had paid particular attention to the presence or absence of enemies that might have been destructive to the oyster and found, as did Gowanloch, “there was no unusual or abnormal abundance of conks or boring sponge or boring clam” and certainly no “particular infestation of dead oysters by these organisms.” He explained that he had made a study of the problems of pollution of water since 1910, and he described in detail the purpose, conduct, and results of the experiments planned by him and carried out by Smith. He stated that because of his knowledge of the fact that an oyster feeds by filtering sea water through its gills, during which process all minute particles and plants in the sea wa
 
 *329
 
 ter constituting its food are filtered from the sea water and, by a very complex mechanism of the oyster’s body, conveyed to its mouth and there digested, he planned these tests in order that he might ascertain what effect oil when mixed with sea water would have on the rate of feeding of the oyster, since the less the amount of water the oyster was able to pump through its gills naturally meant the less the available food obtained by it. In other words, these tests were to disclose what effect oil, when mixed with sea water, would have on the rate of pumping of the water through the gills. To this end the Department of Conservation secured samples of oil from the polluted area and delivered them to him. He mixed this oil with the sea water by a rotating or churning process and thereafter separated it from the water, obtaining a soluble fraction or extract. He varied the strength of this soluble fraction or extract from 100% downward. He found that when the extract was at 100%, the oyster was, in effect, not feeding at all. In his own words we give the results of these experiments: “The final result obtained from the analysis of all the experimental data we assembled, shows that extracts of oil in water inhibits the rate of pumping of water by the oyster. * * * We found that the effect of this extract on the rate of feeding of oysters is proportionate to' its concentration, which means that the higher the concentration the stronger is the effect; that the hundred per cent extract * * * almost completely stopped the feeding of oysters, and that the concentrates between twenty and thirty per cent reduced the feeding activity of the oysters to one half of its normal value. * * * The condition in which the oyster feeds at a slow rate, will completely cease feeding on account of the presence of oil extract in sea water remains as long as this extract is present.” When asked to express an opinion as to whether or not a continuous condition affecting an oyster, to the extent of depriving it of nourishment by fifty per cent, would one day bring about the death of the oyster, he stated:
 
 "My opinion is that undoubtedly the condition as described by you will weaken the oyster and eventually must cause the death of the organism.
 
 * * * I believe even well fed oysters would probably succumb in the time eight to twelve months. * * * The eventual effect will be starvation of the oyster because of the reduced amount of food in the sea water.” (Italics ours.)
 

 The testimony of Smith was substantially that of Golstoff, and he likewise testified as one of the plaintiff’s experts. The testimony of both of these experts in effect corroborates Dr. Gowanloch’s conclusion that the oil, when mixed with sea water, retarded the feeding of the oyster and eventually starved it to death. There are apparently very few available published works dealing with the problem of the effect of oil on aquatic life, but the findings of the three experts who testified in plaintiff’s behalf in this instance are in substantial agreement with the findings of Leenhardt, a French scientist, who showed in a paper published in 1925 that European and Portugese oysters can be killed if they are
 
 *331
 
 kept in water covered with oil or petroleum.
 

 To refute the findings of these three experts, the defendant company relies principally, if not entirely, on the testimony of Dr. Herbert F. Pryterch, who, as theretofore stated, was originally sent by the United States Bureau of Fisheries to investigate existing conditions and was succeeded by Smith after submission of the report of his preliminary surveys to Dr. Golstoff. Pryterch testified that these oysters had not been destroyed by oil pollution but were killed by their natural enemies the boring sponge and the boring clam, the mortality of those not thus killed being due to infestation by a protozonan parasite that had been discovered by him. He identified this parasite as
 
 Haplosporidia
 
 and stated its life cycle and methods of propagation had been worked out by him while this suit was pending.
 

 In his report dated July 13, 1933, covering the investigation of this oyster mortality in Louisiana in relation to oil well operations made by him in cooperation with the officials of the state departments of conservation and health, Dr. Pryterch stated the destruction of the oysters in Terrebonne parish “can be attributed to a large extent to the attacks of two natural enemies, the boring sponge (Cliona) and the boring clam (Martesia) which were found to be particularly abundant on the areas where oyster mortality was greatest.” He estimated that these enemies accounted for 50% or 75% of the mortality but observed that this conclusion did not completely solve the problem in so far as the oil wells are concerned, stating:
 
 “Pollution of the water does occur as a result of oil well operations in Lake Barre asid Lake Pelto.
 
 Varying amounts of crude petroleum and a relatively constant quantity of salt water extract obtained from the oil is emptied into this region and may reach the oyster beds after considerable dilution. If these are toxic to the oyster in such concentrations as may be possible under normal or accidental operating conditions, or if they interfere with the processes of feeding and shell formation, theln they may be indirectly responsible for mortality of the oyster by impairing its ability to withstand the attacks of the boring sponge and boring clam.” And although he ended his report with the statement that “Further investigations of oyster conditions in Terrebonne Parish are contemplated during the coming winter and will be augmented by experimental studies of the effect of crude petroleum and oil well effluents on the oyster and other marine animals,” he made no reference in this report (dated July 13, 1933) to what was referred to in a memorandum printed in the bulletin of the United States Bureau of Fisheries dated June 1, 1935, as his observations in Virginia during the winter of 1929-1930 and in Louisiana during the winter 1932-1933 of the similarity between the abnormally weakened condition of the adductor muscle (the muscle used by the oyster for opening and shutting its shell) in oysters lost in Mobjack Bay, Virginia, and those in Terrebonne parish, Louisiana, or his conclusion that the weakened adductor muscle in the Virginia oysters was due to its infestation with a parasitic protozoan. (Italics ours.)
 

 
 *333
 
 It appears that while Dr. Gowanloch, Dr. Golstoff, and Smith were conducting their very extensive experiments above described, Pryterch personally conducted a series of experiments in an effort to determine the effect of sea water passed through oil and other effluents from the defendant company’s operations
 
 “on the behavior of the adductor muscle” and “the number of hours its shell voould be opened for
 
 feeding.” In his testimony he conceded that the experiments of Smith and Golstoff “were carefully and competently carried out, and if the soluble fraction existed in the waters of Terrebonne Parish within the experimental amounts I believe that that would result in reducing the rate of feeding of oysters.” He was also satisfied with the honesty and sincerity of Dr. Gowanloch and the performance of his experiments, but stated he had been unable to fit the results of Gowanloch’s experiments with those conducted by himself, although he admitted he had failed to duplicate the experimental apparatus used by Gowanloch. (Italics ours.)
 

 It would seem, therefore, that Pryterch’s findings and conclusions resulting from his experiments cannot be said to refute or in any manner contradict the findings of the plaintiff’s experts, since they were limited to determining what effect (1) on the behavior of the adductor muscle and (2) the number of hours an oyster’s shell is opened for feeding sea water passed through oil and the other effluents from the defendant company’s wells would have. As explained by Drs. Golstoff and Gowanloch, anything that will weaken the oyster, whether disease or lack of food, will necessarily weaken the adductor muscle, and, likewise, the mere fact that the shell of the oyster is open does not necessarily mean it is feeding, any more than it can be presumed that a person is feeding every time he opens his mouth.
 

 Dr. Pryterch frankly conceded that his conclusion that “it was not possible to kill oysters with a high concentrate of crude petroleum, sludge and brine over a period of several months” had been based on his observation during his experiments that “none of these oils or substances demonstrated -any effect as to the interference of the normal functioning of the
 
 adductor muscle,”
 
 but that he had “no knowledge as to the question of food supply or the effects of oil on the feeding of those oysters,” since he had made no “study with reference to the effects of crude petroleum on the rate of feeding of oysters,” but had “observed other characteristics” in his experiments, “such as the growth of shell and the condition of the meats.” He did make the flat statement on page 12S of Volume VI of the record that the general experiments conducted 'by him “showed that oysters did better in the water containing the oil than they did in the control,” and when he was immediately thereafter asked whether he had not been “driven to the conclusion that it is a healthy thing for oysters to be subjected to the treatment,” he replied:
 
 “I regret to say that is what many of these experiments showed,
 
 in which in certain cases I noted the shells open so that oil could go in both the experimental and the control oysters and the state at which they would be receiving the oil showed better shell growth and sur
 
 *335
 
 vival than those in the control.” Yet we find Dr. Pryterch, on page 130 of the same volume, reiterating that his experiments had been “carried out particularly to find the effect of oil on the
 
 behavior of the adductor muscle
 
 because it was this condition that was reported to be the primary trouble with the oysters,” and, in reply to the question whether or not he could, without hesitation “say that there is no possible objection to discharging any quantity of oil and polluting waters in any oyster area of this state,” contradicting the statement made on page 125 by declaring: “No sir * * * I don't believe that oil pollution of any kind is advisable in coastal waters.” He was then asked if this statement was not probably due to the fact that he had “knowledge that oil when mixed with sea water either retards the feeding of the oyster or stops the feeding if in sufficient quantities are present” and he answered: ’
 
 “Yes, if present there in sufficient
 
 quantities/' thus corroborating the findings ofGolstoff, Gowanloch, and Smith. Again, when questioned: “Is it not also based upon your knowledge that if oil is discharged in sufficient quantities, the diatome or food of the oyster are either greatly reduced or entirely destroyed?” he replied: “That is the indication of conditions that might follow large amounts of oil pollution.” (Italics ours.)
 

 Besides this, we find that Dr. Pryterch testified he had discovered, during his study of the life cycle and methods of reproduction of his protozoan parasite (to which he attributed the destruction of those oysters not killed by its natural enemies the boring sponge and boring clam), it was impossible for the parasite to complete its life cycle without the presence in the immediate vicinity of crabs. Yet the overwhelming preponderance of the evidence in the record is to the effect that the crabs in this vicinity began to move away with the first appearance in the waters of the deleterious substances discharged by the defendant company during the course of its operations, and that by the time the mortality reached its peak, there were practically no crabs in the vicinity. This testimony by people who were thoroughly familiar with conditions in this area was borne out by the testimony of the experts, including Dr. Pryterch himself, that crabs and other marine life are prone to leave polluted or toxic areas, while the oyst-er, incapable of moving, remains, at the mercy of these substances.
 

 Dr. Pryterch’s statement that from 50% to 75% of the mortality of these oysters was due to the boring sponge and boring clam is also contradicted by the owners of all of the oyster beds in the vicinity, as well as by the men who worked and cultivated them, for their unanimous testimony on this aspect of the case is that there was not abnormal abundance of these natural enemies of the oyster in the beds during this period of time. In addition, Dr. Gowanloch, who accompanied Dr. Pryterch on his trips to these waters shortly after the mortality of the oysters was first reported, testified that in the areas where the mortality was greatest, neither the boring sponge nor the boring clam was present in any greater numbers than would likely be encountered under ordinary and normal conditions, the mortality, in fact,
 
 *337
 
 being comparatively small where these natural enemies were most prevalent. We also have the testimony of Dr. Golstoff, corroborated by Smith, that when he visited the region six months or a year later, “there was no unusual or abnormal abundance of conks or boring sponge or boring clam” and
 
 certainly “no particular infestation of dead oysters by these organisms.”
 
 (Inasmuch as Dr. Pryterch himself testified that it takes from one to two years for the boring sponge, or clam to penetrate the shell of the oyster and cause its death, it is obvious that had these enemies been present in the vicinity in the quantities implied by Dr. Pryterch, they would still have been present when Smith and Golstoff made their surveys and perceptible by an examination of the shells of the oyster, whether dead or alive.) Mr. McConnell, who had been the director of the oyster division of the Department of Conservation since 1926 and was thoroughly familiar with these areas and these enemies, corroborated the statement of Smith, Gowanloch, and Golstoff in this respect, stating that from mere observation an ordinary man could tell that the mortality of these oysters was not caused by the boring sponge or the boring clam and that there were no more of these enemies in the vicinity than one would ordinarily expect to encounter. This is overwhelmingly borne out by all of the plaintiff’s witnesses who either owned beds in the vicinity or fished there and were well acquainted with conditions. They were unanimous in their assertions that neither the boring sponge nor the boring clam was in any greater evidence in the oyster beds than was to be normally expected. Dr. C. B. Coates, a chemical engineer and head of the Department of Chemistry at the Louisiana State University, who testified as one of the experts for the defendant company, stated that while he and his two assistants (also experts for the defendant) found some oysters killed by conks in this vicinity, they found the boring clam did not get into the oysters, and they could not see that the boring sponge had done much damage. Finally, Dr. Pryterch himself admitted that he had made no previous survey of this region and could not state whether the presence of the enemies was normal or abnormal, his conclusion that they were present in unusually large numbers being based on a comparison of the number of the enemies in the Terrebonne beds with those found by him in other states. (Italics ours.)
 

 The other experts proffered by the defendant company did not conduct experiments to determine what effect oil might have on the oyster’s life. Dr. Coates, just referred to, first stated he and his associates (Dr. Arthur R. Choppin, professor of physical and analytical chemistry at the Louisiana State University, and Dr. William Gates, professor and head of the Department of Zoology of the same institution) visited the polluted area for the sole purpose of discovering if hydrogen sulphide had killed the plaintiff’s oysters and that their tests had been limited to this phase of the matter. He later asserted that the purpose of their trips had been sixfold: To ascertain whether the oysters had been killed (1) by their natural enemies, (2) oil, (3) mud, (4) some disease, (5) hydro
 
 *339
 
 gen sulphide, and (6) whether any other marine life around the wells had been affected. He admitted he knew nothing about diseases of oysters and that he had no knowledge of the harmful effect of sea water/ mixed with oil (the so-called soluble fraction, termed by Dr. Coates an emulsion) on the life of the oyster. The conclusion arrived at by him and also by his associate Dr. Choppin, who acted as his analyst, and C. E. Lauer, chief chemist at the defendant company’s Port Arthur refinery, was that the hydrogen sulphide could not have caused the oyster mortality, although Dr. Coates stated it was at his suggestion that the water at the well be chlorinated in order that this substance might be destroyed.
 

 Because of mud and its sediments found in some of the oyster beds in the vicinity, Dr. Gates (and his opinion was apparently that of Dr. W. V. Vietti, another chemist of the defendant company) was of the opinion that this sediment had cut off the oyster’s oxygen supply by clogging its gills and thus strangled it, yet when he was asked whether or not oil on the sea water would result in such strangulation, he replied: “I would hardly expect it, because if oil were to get to the gills it would necessarily have to be in the state of an emulsion which would not deprive the oyster of oxygen,
 
 but might deprive it of food."
 
 (Italics ours.)
 

 The record unmistakably shows that oil, when mixed with sea water, will retard the feeding of the oyster and that if such condition continued for a sufficient length of time the oyster will eventually die from lack of food .and we think the preponderance of the evidence shows that the pollution of the waters with oil and other effluents discharged into them by the defendant company was the proximate cause of the mortality of plaintiff’s oysters.
 

 We do not think, however, that the defendant Shelly Pellegrin is liable in the instant case for his acts were limited to the defendant company’s operations in Lake Pelto and the record does not show that the discharges from these operations was anything more than minor, in comparison with its other operations, with which the defendant Pellegrin had no connection.
 

 For the reasons assigned, the judgment of the lower court, in so far as it dismisses the'plaintiff’s suit as to The Texas Company, is annulled and set aside, and it is hereby ordered, adjudged, and decreed that there be judgment in favor of the plaintiff and against The Texas Company in the sum of $10,650, with legal interest thereon from date of judicial demand until paid, and all costs. In all other respects, the judgment is affirmed.