Levy Collins, Jr., and Temirre C. Collins v. Commissioner. Levy Collins, Sr., and Amelia C. Collins v. Commissioner.Collins v. CommissionerDocket Nos. 70307, 70340.United States Tax CourtT.C. Memo 1959-174; 1959 Tax Ct. Memo LEXIS 74; 18 T.C.M. (CCH) 756; T.C.M. (RIA) 59174; 11 Oil & Gas Rep. 133; August 31, 1959*74 Held, that portions of amounts received from two oil companies by a partnership of which petitioners were partners constituted payments for anticipated damage to leases on oyster beds from the laying of pipelines across such beds, and that no income was derived by the partnership from receipt of such portions except to the extent they exceeded the basis of the leases. The excess held to be long-term capital gain. The remaining portions of the amounts received from the oil companies held to constitute ordinary income. *75 Robert U. Blum, Esq., 1812 National Bank of Commerce Building, New Orleans, La., for the petitioners. Towner S. Leeper, Esq., for the respondent. ATKINSMemorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax, self-employment tax, and additions to tax as follows: Additions to Tax, I.R.C. 1939Income TaxSelf-Employ-Sec.Sec.Docket No.YearDeficiencyment Tax294(d)(1)(A)294(d)(2)703071953$1,785.27$81.00$165.99$110.65703401953758.1881.0064.0142.67In each docket it is alleged that the respondent erred in increasing the income of the partnership, Grand Isle Oyster Company, by the sum of $12,316.42, and hence increasing the income of each of the petitioners on account thereof; in imposing self-employment tax; and in determining additions to tax. In Docket No. 70340 it is also alleged that each petitioner was over 65 years of age in 1953*76 and that the respondent erred in not allowing four exemptions to the petitioners. The principal question presented relates to the tax treatment to be accorded amounts of $10,000 and $3,000, received by the partnership of which the male petitioners were members, from the Texas Company and the Gulf Refining Company, respectively, in connection with the construction of pipelines across oyster bedding grounds under lease to the petitioners. Findings of Fact The petitioners, Levy Collins, Sr. and Amelia C. Collins, are husband and wife, residing together in Cheniere Caminada, Lafourche Parish, Louisiana. The petitioners, Levy Collins, Jr. and Temirre C. Collins, are husband and wife, residing at Golden Meadow, Lafourche Parish, Louisiana. The partnership, Grand Isle Oyster Company, and the petitioners filed Federal income tax returns for the year 1953 with the district director of internal revenue at New Orleans, Louisiana. The petitioners, Levy Collins, Sr. and Levy Collins, Jr., will hereinafter be referred to as the petitioners. Levy Collins, Sr. became 71 years old on December 8, 1958. The petitioners are of French extraction and their language is French, although they speak*77 some English. Neither of them can read or write. During the year 1953 the petitioners were engaged in the business of cultivating, dredging, and selling oysters, doing business as a partnership, Grand Isle Oyster Company. They had been producing oysters many years prior to 1953. In Louisiana oysters live in relatively shallow waters which have a hard bottom. The oyster is stationary, being attached to the cultch (consisting of shells or gravel) on the bottom, and must obtain its food supply from the currents which change, primarily, by the rise and fall of the tide. A certain amount of fresh water is necessary to bring additional food to the oysters. Oyster larvae swim in the water for a short period until they form shells and sink to the bottom where they must attach themselves to some hard surface, such as shell or other cultch. The spat, as they are then called, develop best in brackish or less saline waters. However, the seed oysters are generally moved later to waters having a greater salinity where they will develop faster and be tastier. In Louisiana waters there is a large amount of silt carried in suspension, which is deposited where the current slackens. If too much silt*78 is deposited it will destroy the oysters. A certain amount of silt, not in excess of 2 1/2 inches, over an oyster bed is not detrimental and may even improve the size and taste of the oysters. Thus a change in the water current may be either detrimental of advantageous, depending upon the location of the oyster bed. In Louisiana the use of water bottoms for the cultivation of oysters is regulated by the Louisiana Wild Life and Fisheries Commission, which grants leases which give the lessees the right to produce oysters in specified areas. To obtain a lease from the State of Louisiana one must make a formal application for a survey to be made. The applicant must pay for the survey, and the lease is granted for a term of 15 years, with a right of renewal for an additional 10 years. The rental charged is $1 per acre per year, paid in advance. Upon a renewal another survey is required for which the applicant must pay. The survey fee is $11 for an area of 10 acres or less, $16 for 10 to 20 acres, and 50 cents per acre for each acre above 20 acres. Each lease contains a description of the oyster bedding ground which is leased and provides: "This lease is issued and the water bottoms*79 herein leased shall be held subject to the provisions of Act 54 of 1914, and the rules and regulations of the Department as provided in said Act." Although the lease does not specifically so provide, it is transferable, but a transfer to be effective must be recorded in the office of the Louisiana Wild Life and Fisheries Commission. Some oyster leases are more valuable than others. In 1953 the petitioners had the following leases on oyster bedding grounds located in Bay Canard Gris (also known as Bay Pointe Fine and Bayou Courent), which they had obtained from the Louisiana Wild Life and Fisheries Commission at the times indicated: LeaseAcre-Date ofDate ofDate ofNo.ageApplicationSurveyLease1130965- 6-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-23-4712215157-12-4812- 7-493-29-50122172310-31-4912- 7-493-29-50122181911-29-4912- 7-493-29-5012219222-20-5012- 7-493-29-5012277283- 7-4912- 7-496-14-5012432163- 6-506-28-504- 2-5112883106-29-514-30-521- 7-53They also in 1953 had lease No. 11447 which had originally been issued to Kilraine Cheramie in 1947, covering 52 acres, in Bay Canard Gris, *80 which they had acquired from Cheramie for $3,500, and lease No. 11415 which had been originally issued to Guill Callais, covering 8 acres, in Bay Canard Gris, which they had acquired from Callais for $100 in cash and the transfer to Callais of another lease covering about 10 acres of oyster bedding ground. All the acreage covered by the abovedescribed leases was either contiguous or in the same area of Bay Canard Gris. On June 2, 1953, the petitioner Levy Collins, Jr. applied for a lease on 11 acres of oyster bedding ground located in Bayou Thunder and Bayou la Tremble, which was surveyed on August 4, 1953. As a result of this application lease No. 13988 was issued to the petitioner Levy Collins, Jr. on March 12, 1956. The petitioners had fished for oysters in Bayou Thunder for about 15 years and had had a lease for a long time. They had planted oysters there before it was surveyed. Over a period of 12 or 15 years prior to 1953, the petitioners worked on the reefs in Bay Canard Gris and had improved the bottom by dumping about 240 boat loads of shells or gravel on the reefs. They had obtained the shells and gravel by dredging in other areas. They had also put about 70 boat loads*81 of shells on the reefs in Bayou Thunder and Bayou la Tremble. The only cost involved in these operations was the cost of fuel to operate the boat. The petitioners had used the bedding grounds principally as a source of seed oysters which would then be moved for development to another place between Grand Isle and Cheniere. Some oysters were harvested from this area, but were sold cheaper because they did not have the flavor and were not as large and salty as those which were produced elsewhere. In 1953 The Texas Company planned to lay a pipeline across the oyster bedding grounds in Bay Canard Gris which were being used by the petitioners. It had obtained from the State of Louisiana a right to lay the pipeline. Before proceeding, however, negotiations were had between that company and the petitioners, resulting in a contract under date of May 28, 1953, pursuant to which The Texas Company paid the petitioners $10,000. The contract provided in part as follows: "That LEVY COLLINS, SR., and LEVY COLLINS, JR., hereinafter called grantors * * * for and in consideration of TEN THOUSAND AND NO/100 ($10,000.00) Dollars, cash in hand paid, receipt of which is hereby acknowledged, do hereby*82 grant, convey and warrant unto THE TEXAS COMPANY * * * its successors and assigns, hereinafter called grantee, the right to lay, construct, operate, maintain, inspect, repair, replace, change the size of, and remove a pipe line, in whole or in part, for the transportation of gas, oil petroleum, or any of its products, water and other substances, and such other underground equipment and appurtenances as may be necessary or incidental for such operations, the grantee selecting the route upon, over and through the following described oyster bedding leases situated in the Parish of Lafourche, in the State of Louisiana, to-wit: [Then is listed all the above leases covering oyster bedding grounds in Bay Canard Gris, namely lease Nos. 11309, 12215, 12217, 12218, 12219, 12277, 12432, 12883, 11447, and 11415.] "The grantee, at any and all reasonable times, shall have the right of ingress to and egress from such pipe line for all purposes of this grant. "TO HAVE AND TO HOLD the rights and privileges hereunder granted unto said THE TEXAS COMPANY, its successors and assigns, so long as such pipe line, underground equipment and appurtenances, or any thereof, are maintained. "And by the*83 acceptance hereof the grantee agrees to lay said pipe line below the bottom depth of the leases so that it will not interfere with navigation. And in consideration of the above amount grantors fully release the grantee from all damages, including damages to oysters and the aforesaid leases, which may be suffered from the construction, operation and maintenance of such pipe line." The Texas Company, then, in 1953, dredged across Bay Canard Gris a canal approximately 30 feet wide and 7 to 9 feet deep and laid a pipeline therein. In dredging the canal mud or spolis was deposited on both sides of the canal, forming levies, and mud was deposited for a considerable distance, covering the oysters growing there. The levies retarded the current except where a cut was made for navigation. Since that time no oysters have been taken from the area covered by the 10 leases. Whereas formerly the petitioners had obtained their seed oysters from Bay Canard Gris, they now have to go across the river to Grand Isle and Cheniere for such seed oysters. However, the petitioners have continued to pay the rental on the leases with the hope that some day a strong storm will come and carry the mud away. *84 In 1953 Gulf Refining Company was proceeding to dredge a canal for a pipeline across Bayou Thunder, pursuant to rights which it had obtained from the State of Louisiana and the Federal Government. The petitioners notified the company that oysters had been bedded in that bayou which they expected to sell at a profit when they reached maturity. They protested to the company against the cutting of the canal before obtaining an agreement that Gulf Refining Company would pay the amount of any loss to the petitioners. The petitioner Levy Collins, Sr. placed his boat in front of the dredge and stopped the progress of the dredging for about four or five days while the petitioner Levy Collins, Jr. and an attorney negotiated with the Gulf Refining Company. An amount of $12,000 for damages was demanded, but the amount eventually agreed upon was $3,000, which the company paid to the petitioners. Of this amount, 25 percent, or $750, was paid to the attorney for his services. In this connection Gulf Refining Company and the petitioner Levy Collins, Jr. entered into a contract on October 13, 1953, which provided: "The undersigned, Levy Collins, Jr. * * * hereby acknowledges to have received from*85 Gulf Refining Company, in compromise and full settlement, the sum of Three Thousand ($3,000.00) Dollars and in consideration thereof said Levy Collins, Jr. hereby recognizes and acknowledges the right of Gulf Refining Company, acting through itself or its contractors or subcontractors, to dig across the body of water known as Bayou Thunder and/or Bayou La Tremble, a canal for the purpose of laying therein and, after dredging said canal, laying therein and maintaining and operating a pipe line for the transportation of liquids and in further consideration thereof the undersigned, Levy Collins, Jr. waives and abandons all claims he has or might have or claims to have for damages that may be caused to any oysters or oyster beds in the area covered by an application of said Levy Collins, Jr. dated June 2, 1953, filed by said Levy Collins, Jr. with the Department of Wild Life and Fisheries * * * and any other oysters or oyster beds owned or claimed to be owned by said Levy Collins, Jr., with the right in said Gulf Refining Company to do any and all things in its judgment necessary or proper in order to remove said pipe line, if and when it desires to remove same, and said Levy Collins, *86 Jr. hereby makes his rights under the above mentioned application and any lease that might be granted thereunder inferior and subordinate to the rights of Gulf Refining Company hereinabove described, and in consideration of the above compromise and as part thereof Gulf Refining Company waives any and all claims which it has against Levy Collins, Jr. for damages caused by Levy Collins, Jr. and/or Levy Collins, Sr. on account of interruption of the dredging operations by the contractors and subcontractors of Gulf Refining Company in digging the canal across the above described area and in laying the pipe line therein." Gulf Refining Company completed the canal and laid the pipeline across Bayou Thunder in 1953. Since that time the petitioners have taken no oysters from that area. Prior to that time the petitioners had planted oysters in that area, but afterwards there were no more oysters there. The petitioners have continued to pay annual rent on the lease in Bayou Thunder. In no return of the individuals or of the partnership has there ever been deducted as an expense any amounts paid to Cheramie or Callais for acquisition of oyster bedding ground leases. Nor has there ever been*87 deducted any amount expended in placing shells, gravel, or other substance upon bedding grounds, except fuel for the motor boat used in such operation. Since 1944 the income tax returns of the petitioners and of the partnership were prepared by Earle Angelle, a grocery store operator, who was also a notary public. After depositing the checks which they had received from the oil companies, the petitioners talked to Angelle about the tax liability on account of the payments. He did not know how to treat these amounts, but on two or three occasions, when in New Orleans, he inquired at the Internal Revenue office for advice. He was told by several persons that they did not know, but would later advise him. However, he did not receive such advice, and accordingly when the time came for preparing the tax return for 1953 he did not include in the returns of the petitioners or the partnership any amount of the $13,000 as taxable income. However, he did attach to the partnership return a letter describing these payments as being for damages done to the oysters and oyster bedding grounds, and stated that it was presumed that these amounts covered the damages to oysters and grounds and therefore*88 nullified any income tax due. Of the amount received from The Texas Company, $2,500 was for anticipated damage to oyster bedding grounds. Of the net amount received from Gulf Refining Company $562.50 was of that character. The remainder of the amounts received from those companies was for anticipated damage to oysters. The income tax return of the partnership for the year 1953 shows ordinary net income of the partnership in the amount of $4,530.09. Therein deductions were claimed for provisions, fuels and oils, rental paid for oyster bedding grounds and depreciation on boats. Such return indicates that the interests of Levy Collins, Jr. and Levy Collins, Sr. in the partnership were 67 percent and 33 percent, respectively. In their individual income tax return for the year 1953, the petitioners, Levy Collins, Sr. and Amelia C. Collins, included the amount of $1,510.03 as their distributive share of the ordinary net income of the partnership. The return showed no income tax due and no estimated tax paid for that year. Two exemptions were claimed for Levy Collins, Sr. (one for being 65 years of age or over) and one exemption was claimed for Amelia C. Collins. The return showed*89 self-employment tax in the amount of $33.98. In their individual income tax return for the year 1953, the petitioners, Levy Collins, Jr. and Temirre C. Collins, included the amount of $3,020.06 as their distributive share of the ordinary net income of the partnership. The return showed income tax of $72.00, self-employment tax of $67.95, and no estimated tax paid for that year. The respondent adjusted the partnership's reported income by including as ordinary income an amount of $12,250 received from the two oil companies ($13,000, less $750 attorney fee) and disallowed depreciation to the extent of $66.42, thereby increasing the partnership's ordinary net income by $12,316.42. In the notices of deficiency sent to the individual petitioners, the respondent increased the reported distributive shares of partnership ordinary net income by $4,049.32 in the case of Levy Collins, Sr. and $8,267.10 in the case of Levy Collins, Jr. In each notice of deficiency it was stated: "It is determined that your respective share of amounts received in 1953 by the partnership, Grand Isle Oyster Company, from certain oil companies for the right to lay pipe lines across water bottoms leased by*90 you from the State, constitutes amounts taxable as ordinary income." The respondent allowed the petitioner Levy Collins, Sr. two exemptions and Amelia C. Collins one exemption, as claimed in their joint return. Opinion The respondent has held that the net amount received from the oil companies, $12,250, constituted ordinary income to the partnership. His basic argument is that the amount represented payment for loss of anticipated profits in the oyster business. On brief and at the hearing the petitioners advanced a number of contentions, without elaboration, which may be summarized as follows: that the amounts were paid to the petitioners by the oil companies for easements to lay a pipeline and must be applied in reduction of the bases of the petitioners' leases; that the oil companies could have resorted to the power of eminent domain to obtain the rights of way and, therefore, there were involuntary conversions resulting in losses to the petitioners; the cutting of the canals and the laying of the pipelines resulted in losses in useful value of the leases and hence of petitioners' capital; and that the actions of the oil companies in cutting canals and laying pipelines in*91 effect constituted cancellation of petitioners' leases and that any amounts received should be considered as amounts received in exchange for such leases. Numerous cases hold that the nature of an amount received in settlement of a controversy is determined by the nature of the claims which are settled. Lyeth v. Hoey, 305 U.S. 188; U.S. v. Safety Car Heating & Lighting Co., 297 U.S. 88; Hort v. Commissioner, 313 U.S. 28; Arcadia Refining Co. v. Commissioner (C.A. 5), 118 Fed. (2d) 1010, affirming a Memorandum Opinion of this Court; Raytheon Production Corp. v. Commissioner (C.A. 1), 144 Fed. (2d) 110, affirming 1 T.C. 952, certiorari denied 323 U.S. 779; Durkee v. Commissioner (C.A. 6), 162 Fed. (2d) 184; Swastika Oil & Gas Co. v. Commissioner (C.A. 6), 123 Fed. (2d) 382, affirming 40 B.T.A. 798, certiorari denied 317 U.S. 639; and Chalmers Cullins, 24 T.C. 322. And it is well established that a sum received in settlement based upon a claim of loss of business profits constitutes taxable income, but where the settlement represents*92 damage for lost capital rather than for lost profit, the money received is a return of capital and is not taxable. U.S. v. Safety Car Heating & Lighting Co., supra; Arcadia Refining Co. v. Commissioner, supra; Raytheon Production Corp. v. Commissioner, supra; Durkee v. Commissioner, supra; Swastika Oil & Gas Co. v. Commissioner, supra; Chalmers Cullins, supra; and H. Liebes & Co. v. Commissioner (C.A. 9), 90 Fed. (2d) 932, affirming 34 B.T.A. 677. Leases covering oyster bedding grounds are granted by the State of Louisiana pursuant to the provisions of state statutes. See Louisiana Revised Statutes of 1950, Title 56, sections 421 et seq., which re-enacts prior law. Under such statute a lessee enjoys the exclusive use of the water bottoms leased and all oysters, shells or cultch grown or placed thereon for a term of 15 years, renewable for an additional 10 years. However, it is provided that the granting of such a lease shall not affect in any way the leasing of the waters for mineral purposes. 1*93 In Doucet v. Texas Co., 205 La. 312, 17 So. (2d) 340, the Supreme Court of Louisiana held that the holder of an oyster lease had such ownership in the oysters upon the leased oyster grounds and such a valuable property right in the oyster beds as to support an action for damages resulting from the loss of oysters due to the operations of an oil company which were negligent and in disregard of the rights of the lessee. However, that case and Vodopija v. Gulf Refining Co. (C.A. 5), 198 Fed. (2d) 344 and Vodopija v. Tennessee Gas Transmission Co., D.C.E.D. La., N.O. Div., 152 Fed. Supp. 14, all recognize that the state has the right to issue permits to oil companies for operations over leased water bottoms without obtaining the consent of the lessee, and that the oil companies are not liable except for negligence or disregard of the rights of the lessee. In the last cited case it was stated: "But unfortunately for Vodopija, proof of damage to his oysters by construction of the pipeline is not sufficient to provide recovery therefor. Since Tennessee had a permit from both the State of Louisiana and United States Engineers to construct the pipeline, *94 it had as much right to construct that pipeline pursuant to the permits as Vodopija had to plant his oysters pursuant to his leases. Unless it is shown that Tennessee was negligent in the construction of its pipeline and that negligence caused the damage in suit, there can be no recovery. Vodopija v. Gulf Refining Co., 5 Cir., 198 Fed. (2d) 344; Doucet v. Texas Co., 205 La. 312, 17 So. (2d) 300. * * *"Each industry has a right to operate side by side under its permits or leases, and as long as it operates reasonably and with due regard for the rights of others, any damage to those rights is damnum absque injuria. * * *" At the time the contracts here in question were executed the oil companies had not proceeded to dig the canals or lay the pipelines and had incurred no liability. Any damages were anticipatory or prospective. In determining the nature of the payments we are concerned with the intent of the parties existing at the time of the agreements, and in our consideration of the question we are not limited to the terms of the contracts. See Scofield v. Greer (C.A. 5), 185 Fed. (2d) 551, affirming a District Court decision. *95 Clearly there was no sale, exchange, or cancellation of the leases. They were retained by the petitioners who continued to pay the yearly rental in the hope that a large storm would come and wash away the silt. There was no taking of private property or threat thereof under the power of eminent domain. The property over which the pipelines were laid was public property of the State of Louisiana, which granted the pipeline rights to the companies. Nor did the petitioners grant rights of way in the legal sense. The state, pursuant to its reserved power, granted the rights of way and the oil companies operated under authority of the permits which they had obtained from the state, rather than under the contracts with the petitioners. While the terms of the agreements might indicate that the payments were made merely for a release of any claims for damages against the oil companies which might result from their negligence, the testimony of representatives of the oil companies indicates that something more was intended. Even a normal and careful laying of pipelines could result in damage to oysters and oyster bedding grounds. The canal which is dug is 30 feet wide and the spoils may cover*96 bedding grounds. The testimony of an expert witness called by the petitioners was to the effect that the laying of the pipelines might have been expected to adversely affect the oyster beds, depending upon whether the current was affected, which in turn would be dependent upon the height of the levies, whether the pipeline was laid below the level of the beds, and whether cuts were made in the levies. He, as well as the petitioner Levy Collins, Sr., testified that it would not be possible to dredge across the pipeline and that in any event it would take a number of years to build up a hard bottom over the pipeline itself. The testimony of the representatives of the oil companies was to the effect that it was the custom of the oil companies to indemnify lessees in advance for any anticipated damages to oysters or oyster beds. It is apparent that they had reference to any such damage, irrespective of whether the companies might be legally liable therefor. 2*97 From a consideration of the whole record, we are satisfied that the payments were in part for anticipated damage to the oyster bedding grounds and in part for anticipated damage to oysters. To the extent the payments were for anticipated damage to oyster bedding grounds, and hence to the leases, they constitute payments for damages to capital which are taxable only to the extent they exceed the bases of the leases. However, to the extent the payments were for anticipated destruction of oysters, there can be no question, we think, that they constitute ordinary income under the broad provisions of section 22(a) of the Internal Revenue Code of 1939, 3 since had the oysters been permitted to develop and been sold the proceeds would have been ordinary income. At this point*98 we encounter difficulty. There is no allocation in the agreements themselves, and the record does not furnish a basis for an accurate allocation. Yet, believing that some amount should be allocated to damage to capital, we think we must make the best estimate which we can. Cf. Cohan v. Commissioner (C.A. 2), 39 Fed. (2d) 540. Although the parties knew that the oyster bedding grounds would be damaged where the canal was to be actually dug and probably contemplated that there would be some further damage to the beds from the spoils, we think that the greater portion was intended as a reimbursement for the oyster crop. The petitioner Levy Collins, Sr. testified that it was not anticipated that there would be such widespread damage to the beds as was actually sustained. In the exercise of our best judgment we have concluded, and have found as a fact, that one-fourth of the amount paid in each case represented a payment for anticipated damage to the oyster beds. In the case of The Texas Company payment this amounts to $2,500, and in the case of the Gulf Refining Company payment it amounts to $562.50 (being one-fourth of the net amount after deduction of attorney's fees). *99 The gain derived by the partnership is the excess of these amounts over the adjusted bases of the leases. Under his alternative pleadings and contention (namely, that the petitioners in any event had long-term capital gain), the respondent does not raise any question as to the proper amount of the adjusted basis, but states on brief that the basis to be used for calculation of gain or loss is $3,600, consisting of the purchase price of the leases included in The Texas Company transaction. Since the $2,500 received from The Texas Company does not exceed the basis, the petitioners derived no taxable income from the receipt of the $2,500. The remainder of the amount received from The Texas Company, $7,500, is taxable as ordinary income. In the case of the lease in Bayou Thunder, which was involved in the transaction with Gulf Refining Company, the only basis which the record establishes is the survey cost of $16. Consequently the receipt of the $562.50 resulted in a gain of $546.50. The respondent does not question that this gain is long-term capital gain, and we so hold. The remainder of the net amount received from the Gulf Refining Company, namely, $1,687.50 is taxable as ordinary*100 income. The petitioners alleged in their pleadings that the respondent erred in determining a deficiency in self-employment tax. This subject is not mentioned on brief, nor was it alluded to at the hearing. Presumably the basis for the allegation is that the amounts received from the oil companies do not constitute net earnings from self-employment within the meaning of section 481 of the Internal Revenue Code of 1939, which excludes any gain or loss which is considered as gain or loss from the sale or exchange of a capital asset or from the sale or exchange, involuntary conversion or other disposition of property if such property is neither stock in trade nor property held primarily for sale to customers. Proper adjustment of the self-employment tax liability will be made in the recomputation under Rule 50 in the light of our conclusions hereinabove. It is also alleged in the petitions that the respondent erred in determining additions to the tax under section 294(d)(1)(A) 4 for failure to file declarations of estimated tax and under section 294(d)(2) 5 for substantial underestimations of estimated tax. The petitioners do not discuss this on brief, nor was there any direct evidence*101 or testimony as to whether declarations were filed and if not, why not. The respondent held that no declarations were filed and the returns so indicate, since they show that there had been no payment of estimated tax for the year. *102 In the case of the petitioners, Levy Collins, Jr. and Temirre C. Collins, the return for the year 1953 indicates that there was sufficient income, aside from any income from the oil companies, to require the filing of a declaration of estimated tax. On this record we cannot hold that the respondent erred in determining an addition to tax under section 294(d)(1)(A). There is no evidence at all as to reasonable cause for failure to file a declaration. On the other hand, except for any income from the oil companies, the petitioners, Levy Collins, Sr. and Amelia C. Collins, did not have sufficient income to require the filing of a declaration of estimated tax. Considering the complexity of the tax problems with respect to the payments received from the oil companies, and the good faith efforts made by such petitioners and Angelle to ascertain whether any part of the payments constituted taxable income, we think their failure to file a declaration for 1953 was not due to willful neglect, but was due to reasonable cause. We therefore disapprove the respondent's determination of an addition to tax under section 294(d)(1)(A) in their case. Section 294(d)(2) does not provide for any extenuating*103 circumstances which would afford relief from the imposition of the addition where there has been an underestimation. H. R. Smith, 20 T.C. 663, and R. L. McMurtry, 29 T.C. 1091, affirmed (C.A. 5), 262 Fed. (2d) 589. From our holdings herein, it is clear that there has been an underestimation of tax by all the petitioners for 1953. Additions to tax may be properly determined under both sections, and in the case of a failure to file a declaration it is deemed that there has been a zero estimate. See G. E. Fuller, 20 T.C. 308, affirmed on other issues (C.A. 10), 213 Fed. (2d) 102; Patchen v. Commissioner (C.A. 5), 258 Fed. (2d) 544, affirming on this issue 27 T.C. 592; Hansen v. Commissioner (C.A. 9), 258 Fed. (2d) 585, affirming on this issue a Memorandum Opinion of this Court; and Abbott v. Commissioner (C.A. 3), 258 Fed. (2d) 537, affirming 28 T.C. 795. But cf. Acker v. Commissioner (C.A. 6), 258 Fed. (2d) 568, reversing a Memorandum Opinion of this Court, certiorari granted 358 U.S. 940. Upon the recomputation under Rule 50 the*104 proper amounts of additions to tax under both sections will be computed in the case of Levy Collins, Jr., and Temirre C. Collins, and the proper addition under section 294(d)(2) will be computed in the case of Levy Collins, Sr., and Amelia C. Collins. It is also alleged that the respondent erred in not allowing four exemptions in the case of the petitioners, Levy Collins, Sr., and Amelia C. Collins, the allegation being that each was over 65 years of age in 1953. In the return the petitioner Levy Collins, Sr., claimed two exemptions, one of which was on the ground that he was 65 years of age or over and the respondent accordingly allowed him two exemptions. A similar exemption on account of age was not claimed by the petitioner Amelia C. Collins, and there is no evidence whatever as to her age in 1953. Under the circumstances, this determination of the respondent must be approved. Decisions will be entered under Rule 50. Footnotes1. Such statute also provides among other things: that the leases are heritable and transferable and are subject to mortgage, pledge or hypothecation and sale for debt as any other property right and grants in Louisiana; that a transfer is valid only if registered; that the failure of the tenant to pay rent punctually terminates and cancels the lease and forfeits to the commissioner all the works, improvements, betterments and oysters on the water bottoms; and that when applications are made by two or more persons for the same water bottoms, the applicant who filed the first application has prior claim.↩2. The representative of The Texas Company testified: Q. Now, Mr. Pierce, why did the Texas Company pay the Collinses the sum of $10,000.00 in 1953? A. Well, that payment was made in anticipation of damages to the oyster reef and the oysters thereon. * * *Q. Well, you had the right to lay the line across the oyster bed. A. That's correct. Q. Why did you go ahead and pay more money? A. Well, because that is a customary thing with our company. If we cause someone some damage, we pay for the damage, and in this instance we felt that we would be causing a hardship on Mr. Collins and that we would be depriving him of his oysters and probably damage to the reef where this pipe line would pass and therefore payment was made. Q. Yes. Well, were you under any obligation to pay this, or was this a matter of good public relations? * * *THE WITNESS: Well, I think that there is probably a legal obligation and certainly a moral obligation. * * *Q. Mr. Pierce, has the Texas Company had any difficulty in laying its pipe lines through oyster beds? A. No, not that I know of. Q. Has that difficulty been obviated by arrangements with the farmers? A. Yes, that is correct. Q. Arrangements made to insure that you can lay those pipe lines with the minimum of interruption? A. That's correct. Q. Well, by making these payments, sir, is the Texas Company buying peace? * * *THE WITNESS: Let me say this, that the payments that we make to the oyster people are based on anticipated damage that we would feel our operations will cost in damages to their particular holdings. That is the basis of the payment. Now, I don't quite understand. I think I know what you mean by "peace" but that is not the primary purpose in the payment, no.↩3. Section 22(a)↩ provides that "gains, profits, and income derived * * * from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from * * * the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *"4. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. (d) Estimated Tax. - (1) Failure to file declaration or pay installment of estimated tax. - (A) Failure to file declaration. - In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment due but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. * * * ↩5. Section 294(d)(2) provides in part: (2) Substantial underestimate of estimated tax. - If 80 per centum of the tax * * * exceeds the estimated tax * * * there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax * * * whichever is the lesser. This paragraph shall not apply to the taxable year in which falls the death of the taxpayer, nor, under regulations prescribed by the Commissioner with the approval of the Secretary, shall it apply to the taxable year in which the taxpayer makes a timely payment of estimated tax within or before each quarter * * * of such year * * * in an amount at least as great as though computed (under such regulations) on the basis of the taxpayer's status with respect to the personal exemption and credit for dependents on the date of the filing of the declaration for such taxable year * * * but otherwise on the basis of the facts shown on his return for the preceding taxable year. * * *↩