**John M. VODOPIJA, Plaintiff,**

v.

**TENNESSEE GAS TRANSMISSION COMPANY, Defendant.**

**Civ. A. 5846.**

United States District Court
E. D. Louisiana,
New Orleans Division.

June 18, 1957.

Wild Life and Fisheries Commission of the State of Louisiana. One lease, Number 13394, covers a three-acre tract adjacent to the western shore of the bay and the other, Number 14148, covers 21 acres contiguous to, but northeast of, the three-acre lease. The defendant, Tennessee Gas Transmission Company, was granted a permit by the State of Louisiana to construct a pipeline across Plaquemines Parish along the coast of the Gulf of Mexico. Sandy Point Bay is one of the many bays which dot the coast line of Plaquemines Parish and the pipeline was constructed across the mouth of this bay.

Vodopija contends that some 16,000 sacks of seed oysters planted on his leases during the winter of 1955–56 were destroyed by the spoil banks [1] in the bay built in connection with the dredging of a canal for the pipeline, and by the distribution of that spoil from the banks over his oyster beds by the ebb and flow of the tide. Tennessee denies that any substantial amount of oysters were planted on the leases belonging to Vodopija and that any destruction of such oysters which were planted was not caused by the construction of the pipeline. Alternatively, Tennessee, showing that the lease for the 21 acres was not issued until after the alleged damage in suit and that the plat recorded with the three-acre lease did not follow the lease description, argues that Vodopija was without legal right to place oysters on water bottoms not actually leased by him, and that, consequently, he may not recover for damage thereto.

Although Vodopija testified that the oysters were placed on all parts of both leases during the winter of 1955–56, after the defendant's dredging operation in Sandy Point Bay extending from March 3, 1956 to April 9, 1956, no oysters, living or dead, were found on the small lease and healthy oysters were found only in a staked off one-acre area within the large lease.[2] Dead and dying oysters

Zelden & Zelden, S. Monk Zelden, New Orleans, La., for plaintiff.

Chalin O. Perez, New Orleans, La., Shotwell & Brown, Burt W. Sperry, Monroe, La., for defendant.

J. SKELLY WRIGHT, District Judge.

Plaintiff is the owner of two oyster leases in Sandy Point Bay issued by the

---

1. A spoil bank is a ridge of earth formed along the side of a dredged canal by the earth dredged therefrom.

2. Vodopija testified that he placed the stakes around the one-acre area after he discovered that it was the only section of

were found on the balance of the large lease by biologists of the Louisiana Wild Life and Fisheries Commission on April 26, 1956. These biologists testified that the mortality of the oysters on the large lease, other than in the staked off area, was caused by some six to eight inches of mud which had been distributed over them, making it impossible for the oysters to obtain food. On June 1, 1956, biologists representing the defendant also surveyed the leases for oysters. They were unable to find any oysters whatever on the leases other than the healthy ones on the one-acre area, although one of defendant's experts did admit on cross-examination that there were some recently planted dead and dying oysters covered with mud just north of the healthy bed.

The testimony of the biologists of Louisiana Wild Life and Fisheries Commission is definitely more credible than those biologists, Dr. Bennett and Dr. Gunter, produced by the defendant. Bennett and Gunter, when they made their surveys, were not aware of the location of the Vodopija leases and, consequently, are in no position to say with assurance that their findings refer to those leases. The 21-acre lease had not yet been issued[3] at the time these biologists were in the Sandy Point area and they were under the impression that the small lease was not in the bay, but in the marsh some distance removed from its actual location. Moreover, these gentlemen testified that the healthy oysters they found in the staked off one-acre area were ripe for marketing whereas the evidence clearly shows that the oysters were planted not more than six months prior to the time they made their surveys and two years is generally the period of growth required for an oyster. In fact, the defendant's own lay expert, Pitre, a man with many years actual experience in growing oysters, testified that the oysters which Bennett and Gunter described as marketable were not

more than a few months old. Pitre also admitted there was some damage to the Vodopija oysters by reason of the dredging of the canal.

██ But unfortunately for Vodopija, proof of damage to his oysters by construction of the pipeline is not sufficient to provide recovery therefor. Since Tennessee had a permit from both the State of Louisiana and United States Engineers to construct the pipeline, it had as much right to construct that pipeline pursuant to the permits as Vodopija had to plant his oysters pursuant to his leases. Unless it is shown that Tennessee was negligent in the construction of its pipeline and that negligence caused the damage in suit, there can be no recovery. Vodopija v. Gulf Refining Co., 5 Cir., 198 F.2d 344; Doucet v. Texas Co., 205 La. 312, 17 So.2d 340. Plaintiff has failed to carry his burden of proof in this regard. The proof shows that in order to lay the 26-inch pipeline, it was necessary to dredge a canal 40 feet wide by eight feet deep. This canal was used to float the pipe-laying barge on which the pipe was connected, prepared for laying, and then lowered in place off the stern of the barge. After the pipe was laid, the canal was filled with the spoil which had been obtained therefrom in the dredging.

The mouth of Sandy Point Bay is 2,-500 feet wide. The channel which drains the bay is 500 feet wide and eight feet deep. The balance of the bay is from two to three feet in depth. The channel is approximately 300 feet off the west bank of the bay, and 1,650 feet from the east bank. Dredging in the mouth of the bay began March 24, 1956 and was completed April 9, 1956. The dredging proceeded more quickly than anticipated because the depth of water in the bay reduced the amount of dredging necessary to make the canal. No spoil banks were placed in the channel of the bay and spoil banks four feet high were built across the balance of the mouth of the bay. These banks were staggered from

---

the lease wherein the oysters had not been affected by the dredging operations.

3. This lease was applied for on December 27, 1955, but was not granted until June 4, 1956.

side to side of the canal so that natural drainage across the mouth of the bay would not be affected. These spoil banks remained in place for the thirty days required for the pipe-laying barge to pass over the area and the canal to be refilled. The 15% loss of spoil in Sandy Point Bay was considerably less than experienced by the defendant in other areas. The sand and clay spoil of Sandy Point Bay was less subject to distribution by wind and tide than other less substantial spoil found in swamp dredging. In all, the defendant experienced a loss of 63,-000 cubic feet of spoil in Sandy Point Bay.

■ From the description of operations connected with the dredging of the canal and the construction of the pipeline, this court is convinced that the operation was performed in accordance with sound and accepted engineering practice and with due regard to the rights of others holding oyster leases in the area. This defendant, before it began operations in this and other areas, actually checked the records of the State of Louisiana for oyster leases in order to determine where they were and how the deleterious effect of its dredging and pipeline construction on them could be reduced. In making its check, Tennessee was unable to find recorded the then unissued lease for the 21 acres, and the plat of the three-acre lease made the location of that lease uncertain. Because of the holding that no negligence on the part of the defendant is proved, it is not necessary to decide whether the fact that the 21-acre lease was not issued and recorded until after the alleged damage in suit, or the fact that there was a misdescription of the three-acre lease in the plat negatives the right of plaintiff to recover. It may also be said in passing that there has been no real effort to establish quantum of damage in this case. There is no proof of the cost of the seed oysters nor of their transportation to the leases in question. Nor is there any proof as to what the leases in suit might ordinarily be expected to yield in oysters or money.

This case presents the inevitable collision which occurs when oil and gas operations are performed in the vicinity of leases being operated for the production of oysters, muskrats, etc. Each industry has a right to operate side by side under its permits or leases, and as long as it operates reasonably and with due regard for the rights of others, any damage to those rights is damnum absque injuria. Vodopija v. Gulf Refining Co., supra; Doucet v. Texas, supra.