176 So.2d 236 (1965)
Nick SKANSI
v.
HUMBLE OIL & REFINING COMPANY.
No. 1756.
Court of Appeal of Louisiana, Fourth Circuit.
June 7, 1965.
Driscoll & Flanagan, James T. Flanagan, New Orleans, for plaintiff-appellee.
*237 William L. Von Hoene and Christovich & Kearney, A. R. Christovich, Jr., New Orleans, for defendant-appellant.
Before REGAN, YARRUT and HALL, JJ.
HALL, Judge.
Plaintiff filed suit seeking to recover damages for loss of oysters through oil contamination allegedly occasioned by defendant's drilling operations. The Trial Court rendered judgment in plaintiff's favor for $6,610.00, the amount prayed for, and defendant appealed.
Defendant contends that: (a) plaintiff did not own the oyster lease whereon the oysters were grown and therefore cannot recover herein, (b) plaintiff failed to show any negligence on the part of defendant, and, (c) he failed to show damage sufficient to sustain the amount of the judgment.
At the time the oysters in question were allegedly contaminated they were being cultivated as a State lease or leases standing in the name of John Tesvich, plaintiff's father-in-law. The leases were subsequently formally transferred to plaintiff but not until after suit was filed and not until approximately a year after the alleged damage had occurred. However plaintiff testified that his father-in-law had sold the leases to him about five years before the alleged damage but they had never gone through the formality of having the name changed on the records of the Wild Life & Fisheries Commission. He further testified that he had been the sole operator of the leases for about five years; that all of his operations thereon were consented to by his father-in-law; that his father-in-law did not himself participate in any of the oyster farming operations on the leases; and that he alone together with labor hired and paid for by him had planted and cultivated for his own account the oysters which are the subject matter of this suit.
Under the provisions of LSA-R.S. 56:429 oyster leases are declared to be heritable and transferable but the statute further provides that "* * * No such inheritance or transfer is valid or of any force or effect whatever unless evidenced by an authentic act, judgment or proper judicial deed registered in the office of the commissioner in a book provided for that purpose. * * *."
Manifestly the verbal transfer of the leases to plaintiff by his father-in-law was of no "force or effect whatever". However we are not here concerned with who owned the leases when the alleged damage occurred, but with who owned the oysters which were allegedly damaged. In Doucet v. Texas Co. et al., 205 La. 312, 17 So.2d 340, the Supreme Court in effect held that the owner of a State oyster lease owns the oysters raised on the lease. We find nothing in the statute which prevents either a sale by the lessee of a crop of oysters growing on his lease or which prevents him from permitting another to plant and cultivate a crop of oysters on the lease for his own account.
Plaintiff's testimony, which stands uncontradicted, shows that he was the owner of the oysters which were allegedly damaged and perforce he, and he alone, could recover damages for their loss.
Briefly stated the facts are as follows: Plaintiff planted the oysters in question in the fall of 1961 and began harvesting them in February 1962 and shipping them to his preferred customer, Martina & Martina, in New Orleans. After the first or second shipment Martina & Martina notified him that the oysters had an oily taste and that they would accept no more oysters from him that season. Martina & Martina however paid for the oysters they had received.
Plaintiff immediately taste tested oysters taken from the lease and confirmed the fact that they had an oily taste. On February 16, 1962, within the week following receipt of the complaint from Martina & Martina, *238 plaintiff reported the oily taste of the oysters to the Wild Life & Fisheries Commission who sent their marine biologist, Mr. Friedrichs, to investigate and to take samples of the oysters and mud from the lease.
Mr. Friedrichs made his investigation promptly and made an official written report to the Wild Life & Fisheries Commission in which he stated that all of the oysters tasted by him and his assistant tasted of oil. His report concludes with the following:

"Summary. Observations in the area indicate that the drilling rig near the sulphur mine had lost oil in the course of their operation, causing contamination of the oysters in Billet Bay on the lease operated by Mr. Nick Skansi, rendering the oysters unsalable."
Mr. Friedrichs testified in accordance with his report. His assistant, Captain James Maronge, also testified as to the oily taste of the oysters taken from the lease, and the record leaves no doubt that the oysters had become contaminated with oil.
Defendant apparently concedes that the oysters were oily tasting and unmarketable for that reason. His second specification of error is that there is no positive evidence of any negligent act on the part of defendant or its agents.
The record shows that defendant was reworking an oil well in the area in February of 1962 and that defendant's rig was the only one operating in the area at the time. Mr. Friedrichs testified that during his investigation he observed an oil slick on the water in the vicinity of this well and the record shows that there is a strong incoming tide which runs past the well site in the direction of the oyster lease.
During the course of his investigation Mr. Friedrichs took mud samples at six points between the lease and the well. These samples were analyzed in the Commission's Pollution Division laboratory and found to have varying degrees of hydrocarbon content. Five of the six samples taken showed a hydrocarbon content which increased progressively from the lease to defendant's well site.
In an effort to overcome the official report of the Wild Life & Fisheries Commission, defendant had its own experts make an investigation of the area and take its own mud samples. This investigation took place in June 1962, four months after the oyster damage complained of. Defendant's experts testified that in June and July the oil content in the water, in their opinion, was not capable of permeating the oyster bedding ground of the plaintiff. They would not say however that the Commission's report was wrong and admitted that it was not possible for them to tell what conditions existed at the time of the alleged damage which took place in February.
Defendant's witness, James V. Langston, its District Operating Superintendent of Production, confirmed the fact that defendant's oil rig was operating in the vicinity of plaintiff's oyster bed in February 1962 but stated that it was not engaged in drilling for oil but was reworking an old well. He then testified that reworking operations were quite different from drilling operations and stated that in reworking operations there should not be any undue oil waste if there is no malfunction. He admitted that if waste occurs it shows that there has been a malfunction.
The testimony as a whole convinces us, as it did the Trial Judge, that plaintiff's oysters were contaminated by oil from defendant's well, and that this would not have occurred except for some fault or negligence on defendant's part.
Defendant's final specification of error is that plaintiff failed to show sufficient damage to sustain the amount of the recovery.
*239 Plaintiff testified that when he found the oysters had become unmarketable by reason of oil contamination he endeavored to minimize his loss by harvesting all the remaining oysters on the leases and replanting them in an unpolluted area where they were left for a time sufficient to purge them of their oily taste. By doing this he was able to salvage 3,120 sacks of oysters which he later sold. However, he testified that he lost some oysters in making the transfer and some were lost due to an increased mortality rate brought about by the oil pollution. He had originally planted 1,260 barrels of seed oysters from which the normal yield would have been 5,040 sacks and calculated his loss at 1,920 sacks being the difference between the expected normal yield and the amount he was able to salvage.
Plaintiff ordinarily sells these oysters for $3.50 per sack but his pleadings limit him to $3.00 per sack. His claim is therefore for the loss of 1,920 sacks of oysters at $3.00 per sack or $5,760.00. In addition thereto he testified that his labor and other expense in transplanting the 3,120 sacks of oysters which he succeeded in salvaging amounted to $50.00 per day for a total of 17 days, or $850.00.
Plaintiff's testimony on the amount of his loss stands uncontradicted. He proved it by the only method available to him. See Brantley v. Tremont & Gulf Railway Co., 226 La. 176, 75 So.2d 236. Defendant however seems to argue that plaintiff should in no event be allowed more than his expected net profit on the 1,920 sacks of oysters lost. We confess to being unable to follow this line of reasoning. He not only lost his net profit but all the expense of planting and cultivation which goes to make up the sales price.
For the foregoing reasons the judgment appealed from is affirmed, costs of this appeal to be borne by defendant-appellant.
Affirmed.