380 So.2d 639 (1979)
CAPTAIN KEVIN CORPORATION
v.
BAY DRILLING CORPORATION et al.
No. 12913.
Court of Appeal of Louisiana, First Circuit.
December 27, 1979.
*640 Robert B. Butler, III, of Schwab & Butler, Houma, for plaintiffs, appellants in devolutive appeal, appellees in suspensive appeal, Captain Kevin Corporation, R. A. Toups, Inc., Joseph Toups, Dallas A. Toups, Inc.
John D. Fitzmorris, Jr., New Orleans, Donald L. Peltier, Thibodaux, for defendants, appellant in suspensive appeal, appellee in devolutive appeal, Bay Drilling Corporation Texaco, Inc.
Before ELLIS, CHIASSON and PONDER, JJ.
CHIASSON, Judge.
This is a suit by the owners of oyster leases of State land for damages to their oysters allegedly caused by the negligent drilling of an oil well by the drilling contractor of the mineral lessee of the same land. The owners of the oyster leases are plaintiff-appellee Captain Kevin Corporation (Leases Nos: 22563, 18967, 22565, 22567, 18966 and 19761); plaintiff-appellee Joseph Toups (Leases Nos: 22564, 16961, 16962 and 22734); and Dallas Toups (Leases Nos: 22508 and 22511). Plaintiff-appellee R. A. Toups, Inc. used and operated Leases Nos. 16962 and 22734 and was the owner of the oysters located thereon by agreement with Joseph Toups. Plaintiff-appellee Dallas *641 A. Toups, Inc. used and operated Leases Nos. 22508 and 22511 and was the owner of the oysters located thereon by agreement with Dallas A. Toups.
Additionally, plaintiffs Ernest Voisin, Roger Toups and Dallas Toups filed suit for mental anguish because of the destruction of the oyster crop, which claim was denied by the trial court. Plaintiff Motivatit Seafoods, Inc. filed suit for loss of profits from preparation and sales of oysters which Captain Kevin Corporation was unable to supply and this claim was also denied by the trial court.
The trial court awarded damages to the owners of the oysters as follows:

Captain Kevin Corporation $50,627.00
R. A. Toups, Inc. $14,140.00
Joseph Toups $24,005.00
Dallas A. Toups, Inc. $17,360.00

The defendants-appellants are Bay Drilling Corporation (Bay), the drilling contractor, and Texaco, Inc., the mineral lessee. All costs were assessed against appellants.
Appellants Texaco and Bay appealed the judgment of the trial court awarding damages to the oyster owners and plaintiffs Ernest Voisin, Roger Toups, Dallas Toups and Motivatit Seafoods, Inc. appealed the judgment of the trial court dismissing their respective demands. The oyster owners answered the appeal of Texaco and Bay seeking an increase in the amount of damages awarded to them.
The record reveals that oysters in the Bay des Islettes area are planted generally in the fall and winter and are harvested in the following spring and summer. The oysters have to be harvested before the late summer because in the latter part of summer a significant number of conchs, a predatory snail, appear and kill the oysters.
In early May of 1976 appellees were harvesting and selling oysters from their leases. There were no problems from pollution or oil contamination. At this time the appellants were in the process of drilling a well from a submersible drilling barge. The well site was located to the northwest of appellees' oyster leases. The net current flow in this area is from northwest to southeast, that is, from appellants' well site over appellees' leases.
The drilling of the well commenced on April 4, 1976 and was concluded on June 22, 1976. On May 6, 1976, the drill stem was sticking and Bay injected 90 barrels of diesel into the drilling mud. This did not prevent the sticking and on May 7 Bay injected 650 barrels of a special fluid known as "Black Magic", which is composed of 75% diesel and which acts as a solvent and a lubricant to free a stuck pipe. On May 14 an additional 210 barrels of Black Magic was injected into the well.
On or about May 24 appellees began to receive complaints of an oily taste in their oysters. This was reported by the appellees to the Louisiana Wildlife and Fisheries Commission and on June 2, Robert Ancelet, a biologist with the Commission, made an investigation and took samples of the area for analysis by Shilstone Testing Laboratories. The analysis showed extremely high concentrations of barium and hydrocarbon in the sample taken 150 feet west of the drilling rig which is the area that the keyway of the rig faced.
On slightly varying dates in early June, appellees ceased harvesting oysters from the leases involved because of oil contamination. Tests were taken periodically thereafter but the harvest could not be resumed because of the contamination, except for a few oysters from the northernmost reefs.
Texaco and Bay list as assignments of error the following:
1. The Court erred in finding that plaintiffs' oysters were oily.
2. The Court erred in finding as a fact that Black Magic was circulated out of the mud system and discharged into the waters.
3. The Court erred in finding that Bay and Texaco negligently conducted operations of their mineral activities.
4. The Court erred in finding that harvestable populations of oysters remained on plaintiffs' reefs.
*642 5. The Court erred in awarding money damages to these plaintiffs.
Appellants correctly contend that they are entitled to a full and complete review of the facts under the provisions of the Constitution of 1974, Article 5, Section 10(B). Appellants also correctly set forth the standards of review by which we are bound. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Appellants argue that a review of the transcript and record in this case will clearly establish that there is no evidence which can reasonably be interpreted to support the trial court's findings. We disagree.
As to appellants' first specification of error, it is contended that appellees' case rises or falls upon the credibility and validity of taste tests performed by Mr. Ancelet. They allege that Mr. Ancelet committed serious error by informing the tasters that the tests were being performed to check on a possible oil contamination problem. Appellants and appellees devote much of their argument in briefs to the validity of these tests. The trial judge did not comment upon the tests in his reasons for judgment.
We find that it is unnecessary for us to determine what weight should be given to the taste tests' results because we find appellees did prove that the oysters were contaminated with oil by reasonably credible evidence apart from the tests. This fact was testified to by each of the appellees and corroborated by the testimony of buyers and their employees, of consumers, and of other disinterested witnesses.
By expert testimony appellants also contend that it was physically impossible for the amount of oil involved herein to contaminate appellees' oysters. One of the theories of the expert is that the oysters involved herein, being four to six feet under water at all times, could not be affected by the oil because oil floats on the surface of the water. Appellees produced expert testimony that harmful ingredients in oil would diffuse throughout a column of water.
The trial judge, therefore, did not err in finding that appellees' oysters had an oily taste.
As to specifications of error numbers two and three, the record reveals that the drilling of a well, insofar as relevant herein, consists of circulating drilling mud in the hole and, as it come up, running it across a shaleshaker. This device is basically a screen which shakes and allows the liquid mud to fall through and remain in the mud system while at the same time trapping the cuttings from the hole and depositing them into the "possum belly." There is a constant stream of water pumped into the possum belly which washes the cuttings and any other material attached to them into the keyway. The stream of water continues on out under the bottom of the keyway into the bay carrying with it various particles. When the mud and cuttings are uncontaminated this method of operation does not cause any problems. When the mud and cuttings are contaminated with diesel it can be expected that oil will accumulate in the keyway. In this particular case, about 20 barrels of oil were removed from the keyway by employees of appellants with the use of cans attached to a stick to remove the floating oil.
The testimony convinces us that all of the oil was not segregated and some was allowed to escape from the keyway.
This conclusion is supported by the testimony of witnesses who saw an oil sheen on the waters near the drilling barge; the testimony of Mr. Ancelet that a brownish material was billowing out from the keyway; the testimony of Texaco's drilling and production foreman that if a stream of discolored water could be seen coming from the keyway, it would probably indicate that something was wrong; the testimony of a professional petroleum engineer and of a state pollution inspector that mud contaminated with diesel should not be allowed in the keyway; and the inability of appellants to account for the disposition of the contaminated mud by credible evidence.
We therefore concur in the following findings by the trial judge:

*643 "... (T)he court finds as a fact that the area in which the oyster leases in question were located was not polluted before the introduction by defendants into its well of diesel oil and Black Magic in early May of 1976. The court further finds that the evidence has proved that the area was polluted shortly after this substance was circulated out and discharged into the waters. Plaintiff has satisfied its burden by a preponderance of evidence that the contamination of the water was due to the negligence of defendants in its handling of the oil and Black Magic which it introduced into its well hole in an effort to free a stuck pipe and is, therefore, liable to plaintiffs for any damages suffered as a result thereof."
The jurisprudence at the time of the occurrence of the damages herein was to the effect that the oyster lessee must prove negligence and lack of due care on the part of the mineral lessee in the exercise of its rights under the mineral lease and no recovery could be had in the absence of a showing of negligence. Trosclair v. Superior Oil Company, 219 So.2d 278 (La.App. 1st Cir. 1969); Jurisich v. Louisiana Southern Oil & Gas Co., 284 So.2d 173 (La.App. 4th Cir. 1973).
The finding of negligence resulting in appellants' liability to appellees for damages to their oysters is amply supported by reasonable and credible evidence.
As to specifications of error numbers four and five, we find, as did the trial judge, that the nature of oyster planting and harvesting is such that an exact and minute calculation cannot be precisely determined. When oysters are planted they are not individually counted or packed in known quantity containers. They are loaded upon the deck of a boat of known dimensions and stacked to certain heights. The estimates of the quantity of oysters on each boat are not purely speculative. The trial judge did not err in accepting the amount of planted oysters as testified to by appellees and their witnesses. Nor did the trial judge err in his findings of the amount of unharvested oysters. There is overwhelming evidence that the method used by appellants' expert to calculate the amount of oysters remaining on the reefs was not the best method. Nor is there any evidence to indicate that the oysters herein sued for were in fact harvested.
The approach used by the trial judge to compute appellees' damages was to take the number of sacks planted and subtract therefrom the number of sacks harvested to arrive at the number of sacks of oysters remaining to be harvested. To this figure the trial judge added a 10% growth factor and subtracted 25% because of natural attrition from predators and the physical inability to recover 100% of the oysters planted. The trial judge then subtracted from this figure the cost of harvesting the remaining oysters at $1.00 per sack and arrived at the net loss to each appellee. To this figure he added, where appropriate, the cost to clean the reefs of unharvested oysters. All of these items are supported by the evidence.
We find this method of calculating damages to be reasonable under the circumstances. Lauzon v. J. C. Trahan Drilling Contractor, Inc., 247 So.2d 236 (La.App. 4th Cir. 1971) writ refused 259 La. 69, 249 So.2d 206 (1971); Skansi v. Humble Oil & Refining Company, 176 So.2d 236 (La.App. 4th Cir. 1965).
Appellees in their brief concede the reasonableness of this method and withdraw the request for an increase in damages contained in their answer to the appeal. Captain Kevin's claim for damages was properly based on the sale price it was receiving per sack of oysters sold.
As to the appeal of Ernest Voisin, Roger Toups and Dallas Toups, we concur with the trial court's holding that there is absolutely no evidence to sustain the claims for mental anguish.
As to the appeal by Motivatit Seafoods, Inc., it appears that Captain Kevin Corporation was owned and controlled by Ernest A. Voisin who also owned and controlled *644 Motivatit Seafoods, Inc. Captain Kevin Corporation sold its oysters to Motivatit Seafoods, Inc. at a price 50 cents per sack below the going market price. Motivatit claims it lost a profit of 50 cents per sack for each sack of oysters Captain Kevin Corporation was unable to harvest because of appellants' negligence. It seeks to recover this damage from appellants herein. We agree with the trial court's holding that appellants' liability cannot be extended to cover this loss.
For these reasons the judgment of the trial court is affirmed at appellants' costs.
AFFIRMED.