512 So.2d 653 (1987)
George J. BUTLER, et al.
v.
Winston C. BABER, et al.
No. CA-4569.
Court of Appeal of Louisiana, Fourth Circuit.
August 28, 1987.
Writ Granted November 13, 1987.
*654 Alvin A. LeBlanc, Jr., Kenner, for plaintiff.
J. Walter Ward, Jr., Christovich & Kearney, New Orleans, for defendants, Winston C. Baber, d/b/a Progress Petroleum Co., and Highlands Ins. Co.
Jesse S. Guillot, New Orleans, for defendants, Robert P. Waldron, Individually, and Robert P. Waldron, Inc.
Before GARRISON, BARRY and CIACCIO, JJ.
CIACCIO, Judge.
George Butler, George Butler, Inc., and Leo Bianchini[1] appeal a judgment which denied recovery for alleged damage to oysters and water bottoms on their leases in Plaquemines Parish.
Plaintiffs sued Winston Baber d/b/a Progress Petroleum Company and his insurer Highlands Insurance Company, after Progress dredged a canal through Wilkinson Canal (a portion of Bayou Dupont) and the marsh into Wilkinson Bay. Included as defendants were Robert Waldron, Robert Waldron, Inc., the consultant hired to determine alternate routes for the canal, Southern Louisiana Contractors (SOLOCO), the dredger, and J. Ray McDermott & Company, hired to backfill and dam the canal. SOLOCO and McDermott compromised and were dismissed along with their third party demands.
Plaintiffs primarily argue that the trial court erred by concluding that they did not carry their burden of proof, and in failing to consider strict liability under La.C.C. Art. 667. Defendants/appellees reply (as in their answers below) that Leo Bianchini's claim had prescribed and that George Butler has no right of action.[2] The defendants also contend that the judgment is not clearly wrong.

I
At issue are a number of oyster leases in Wilkinson Bay: nos. 18515, 19386, 19387, 20057, 20058, 20135, 20136, 20569, 21936, 21937, 21942, 21943, 21986, 23386, 20247, 21984, 21989, 21990 and 23688. Bianchini and Butler had jointly owned 20247 and 21984, Butler owned 21989 and 21990, and the others were sold by Bianchini to Butler *655 on August 26, 1977, and recorded on August 31, 1977. An Act of Correction was executed on November 6, 1979, and the transfer was registered with Wildlife and Fisheries on November 13, 1979.
With the exception of No. 18515, the leases were sold by Mr. and Mrs. Butler to Oysters Champagne, Inc. (whose president was Dr. Hugh Champagne)[3] on December 7, 1979. In an Act of Correction dated November 29, 1982, the Butlers reserved their right to any cause of action arising from Progress's drilling and dredging operations in the Wilkinson Bay area. In June, 1983, George J. Butler, Jr., Inc. assigned any judgment in this suit to Delta Bank and Trust Company.
Baber obtained state mineral lease no. 7502 for Tract No. 14692 which covered the Wilkinson Bay area. The lease provides: "[I]n conducting all operations under this Lease requiring dredging, filling, or local navigation in order to explore, develop or exploit shallow-water areas, Lessee shall comply with the applicable requirements of the appropriate Louisiana state agency charged with the environmental management of said area."
It further states that after completion of operations "the affected water bottoms shall, to the extent reasonably possible of accomplishment, be returned or restored to a condition as nearly equivalent to that which existed before said operations were conducted and/or structures were constructed." The language notes that the mineral lease is in an oyster restricted area and all operations were to be in strict conformity with regulations.
Baber obtained canal right of way servitudes from two land owners, and those documents state his intention to "sweep out" the Wilkinson Canal and/or Bayou Dupont to a depth of eight feet and to then dredge across the land area. The right of way was for a 70 feet width with the right to deposit the spoil on the adjacent area. The documents declare a fill dam would be deposited across the west end of the canal adjacent to Wilkinson Canal and at the east end at the entrance to Wilkinson Bay. The soil dam was to be above the marsh to compensate for settlement. The fill was to be "carried not only the seventy (70') foot width of the original canal, but also an additional twenty (20') feet back from the existing banks at each side of the said canal."
Baber obtained a Damage Release from Butler for $8,000 which waived damages that had or may occur to oyster lease no. 20135 insofar as the damages may result from operations, including dredging related to Progress's proposed lease 7502, well no. 1 in the Bay. The release was limited to the area "500 feet wide from center of canal and slip...."
Progress obtained a permit from the Army Corps of Engineers to "dredge and maintain channels and a canal" in Wilkinson Canal, Wilkinson Bay and the adjacent wetlands central to a point about 8.0 miles southerly from Myrtle Grove, Louisiana. The permit contained a special condition: "That no dredged material is to be placed in the oyster planting area or in the small area of natural oyster within lease No. 20135 as identified in letter from Mr. Robert Waldron dated 28 February 1978 to Progress Petroleum Company." Sheet 1 of the attached survey declared: "NO SPOIL TO BE PLACED IN WILK. CANAL. SPOIL PLACED IN WILK. BAY WILL NOT DECREASE WATER DEPTH BY MORE THAN 0.5 FT." Sheet 1A noted: "Spoil to be placed on land."
The permit survey allowed a total of 157,072 cubic yards of material to be swept along the route. The permit and survey marked the route recommended by Robert Waldron, Baber's geological consultant, who had selected three alternatives. The route from Wilkinson Canal/Bayou Dupont cut across the marsh to the north and east and went to the well location in Wilkinson Bay. The original permit positioned the *656 well immediately north of an oyster planting area on Butler's Lease No. 20135. The Corps of Engineers required that it be moved. The amended location (okayed by Waldron) placed the well 600 feet north and 200 feet east of the original site. In a letter dated April 13, 1978, Waldron stated the change would remove the drilling operation from the oyster area "allowing the canal and well slip dredging to be performed with no fear of depositing spoil within the shell fish planting."
Baber hired SOLOCO to dredge the 70 foot wide canal through Wilkinson Bayou and the marshland into Wilkinson Bay. SOLOCO's dredge superintendent testified the dredge went off Wilkinson Canal at a 90 degree angle, headed east toward the bay, and made a couple of turns to skirt the edge of ponds (except one pond which was cut through). SOLOCO used a 4 cubic yard dredge which made a 45 foot path along the left side, turned around, then cut the additional width on the way back. The spoil was placed on the left side going toward the bay and on the right on the way back. The dredging ended in June, 1978, and the canal was kept open for months during the drilling operations.
The well was dry, so McDermott was hired to plug the western and eastern ends of the canal. Unlike SOLOCO, McDermott used a full-sized dredge. The spoil bank was backfilled. McDermott's dredge captain testified the dams were placed two feet above the marsh level. There was considerable testimony by experts, plaintiff and defendant, that the dams had washed away and could be crossed.

II
Rodney Adams, an expert in geology sedimentation, sediment process interaction in the environment, and the impact of dredging operations, testified he found 2-6 inches of very organic fluid clay on various Butler oyster leases on November 14,1979. On December 31, 1981, May 5, 1982, and July 10, 1983, the bay was no less saturated with the mud. He testified the only source of materials to produce that amount of unnatural material in the bay would be the dredging of the Progress canal and the flushing of materials from within the canal while it was open.
Dr. Steven Murray, an expert in sedimentation transportation, observed unconsolidated material in significant thicknesses in Wilkinson Bay on May 1, 1980. He also observed a one knot current from the canal which flowed north when the tide rose and south when it fell.
Ronald Delaune, an expert in soil chemistry and marsh soils and sedimentation, first investigated Wilkinson Bay on November 14, 1979, with Rodney Adams. Instead of the usual firm bottom expected, he found 2-6 inches of unconsolidated very loose mud which was still present in May 1980 and December 1981. Both Mr. Delaune and Dr. Murray found very similar sediment in the bay, Progress canal, and Bayou Dupont.
The combined report of Adams, Murray and Delaune found three sources of sediment which was caused by the dredging: (1) the sediment naturally moving down the system; (2) sediment that washed from the dredging material along the bank of the Progress canal; (3) sediment material coming out of the ponds. According to Dr. Murray, one-third of the flow from Bayou Dupont was diverted by the new canal to Wilkinson Bay. 1.14 million cubic feet of sediment was introduced into the bay because of the first source. Using the permit allowance for dredging and calculating that 10% would be washed back into the system, computes to over 2 million cubic feet caused by the second source. Dr. Murray estimated 3 million cubic feet came from sediment in the ponds that settled in the bay.
Dr. Murray calculated the total from all three sources to be 4-6 million cubic feet. Adams estimated the total material in the bay to be 5 million cubic feet. The report indicated a potential of 8 million cubic feet. Dr. Murray testified that dredging a narrow canal, then widening it to the full permit width, was environmentally unsound and would cause additional silt overburden; however, his estimate of over a million cubic feet from the first source did *657 not include that additional damage estimate.
Dr. H. Dickson Hoese, an expert in marine biology, marsh ecology and oyster cultivation, testified that oysters prosper in water with a mid-salinity range (allowing for fresh water influx). He rated Wilkinson Bay a little below optimum. Yet, on November 10, 1978, he found large amounts of mud and blackened oysters on a number of the Butler leases and a high mortality rate. All the animal life was dead. Something had wiped out everything, not just oysters. Both large and small oysters were equally affected. The oysters were either poisoned by hydrodgen sulfide (caused by sulfite production associated with Louisiana's highly organic mud) or died from lack of oxygen due to being buried. Disease was not present. Assuming sufficient sediment was coming through the canal, Dr. Hoese concluded the most probable cause of the oyster mortalities was the canal dredging.
The four experts all referred to the May 28, 1978, report by Robert Ancelot, the Wildlife and Fisheries biologist who investigated the area and found suitable conditions for oyster cultivation before the canal dredging began. Ancelot, an expert in oyster investigation, took samples because of complaints lodged by Butler concerning the proposed canal. He found conditions favorable, salinities low, and the bay had a smooth, firm bottom and the oysters appeared normal.
Ancelot returned in October and November, 1978, after the Progress canal had been dredged and the spoil bank was in place. He took samples in the same locations and found the mortality rates on leases south of the dredged canal significantly higher. One lease had a 100% mortality. He found a 3-4 inch overburden of mud on the oysters on some leases and the oysters were blackened.
Mortality rates on lease 20135 jumped from 41% to 76.7%, and 17% to 38.4% and from 18% to 60.8%; on lease 21936 from 22% to 39%, and from 10% to 19%. The mortality rates on the leases north of the channel remained constant. He concluded the obvious disturbance of sediments was caused by the dredging. Disease played an insignificant role, if any.
Ancelot testified that there were problems in the area in 1971 due to fresh water influx, low salinities (at times), and hurricanes in prior years. He did not feel any of those problems had relevance to this litigation.
Charles Dugas, a marine biologist/investigator for Wildlife and Fisheries since 1977, was called by the defense. He participated in compilation of data for Ancelot's May 24, 1978, report which found the bottoms sufficient for oyster production. The one rather high mortality rate found by Ancelot that day was attributed to fishing pressure. Dugas made observations on the September and November, 1978, trips and testified to mud covering the oysters and a very high increase in mortality rates.
Dugas testified that the mud probably caused the oyster mortalities, and that dredging the canal caused the mud overburden. He declared the fresh water influx of 1979 did not cause this damage in 1978. He stated that as recently as 1983 lease 20135 still had no oysters.
Robert Waldron, the geological consultant hired by Baber and made a defendant in this suit, was permitted to testify as a defense expert witness. Waldron testified that the route chosen for the canal was the shortest route across the marsh and reduced the flow of sediment. In 1960 the area had desirable conditions for natural oyster growth. However, he stated Wilkinson Bayou and Bay had filled considerably since the early 1970's. On February 24, 1978 (pre-dredging), he found some mud bottoms, fairly high mortality rates and blackened oysters. David Cvitanovich, his associate and oyster lease owner, corroborated that testimony and stated there were no young oysters for future harvests. Waldron stated Butler told him lease 20135 had been bedded with oysters three years prior to the dredging, but many had been lost due to excessive fresh water. Waldron testified that he watched the dredge cut an approximately 40 foot channel and dredge *658 back up to the 70 foot width. Cvitanovich's testimony was similar.
On February 20, 1980, Waldron observed that the end plugs had been partially washed away, and the one at the Wilkinson Bay end had 3 ½-4 feet of water over it. Plaintiffs' experts also noted the poor condition of the canal dams. Waldron stated that there was no spoil above the water in the bay and he claimed there was no current in the canal.
Utilizing 26 years of experience in Wilkinson Bay, Waldron concluded that there was some silt buildup of varying amounts. Most leases had approximately ½ inch, and one had 3 ½ inches. He conceded that there was silt buildup in the bay which he felt was due to Hurricane Carmen in 1973 and the bay's natural deepening.
Dr. Terry Dantin, a civil engineer, was accepted as an expert in hydrology and testified to his observations in October, 1982. He stated that more water would flow from the bay into the canal, in an east to west direction, than in the opposite direction from the canal into the bay.
The plaintiff and defense experts agreed that varying depths of mud covered the oysters on at least some of Butler's leases. Referring to three of the leases, Robert McCafferty, Butler's oyster fisherman, testified that in 1976 to 1978 he would catch 150 to 200 sacks in a two day trip. He stated that there was no problem with blackened oysters until around May, 1978. Mrs. Butler's informal records also indicate a substantial harvest during the years prior to the dredging.
Waldron clearly indicated that there were numerous healthy oysters on lease 20135 prior to the dredging. He testified that the bottom of 20135 in February, 1978, was firm to hard with a soft cover. He appraised the leases consisting of 7.9 acres which would be disturbed at $500 to $700 per acre. He estimated there were over 500 sacks of oysters present and figured at $7 a sack the total would be $3,640. Yet in October, 1979, (post-dredging) a lease next to a Butler lease sold for about $45 an acre. Other leases sold for less.
Baber relied on Waldron's expertise, yet the mud overburden appeared. Although the permit carefully restricted use of the area by the mineral lessee and allowed only 157,072 cubic yards or 4.24 million cubic feet to be swept, the experts calculated over 4-6 million cubic feet of mud had made its way through the canal and settled over the oyster leases. Dr. Hoese, a biologist, attributed the oyster mortalities to the silt overburden, as did Charles Dugas, the Wildlife investigator. Baber and Waldron would have placed the drilling well almost over the oyster planting area except that the Corps of Engineers insisted that the location be moved. The healthy oysters (prior to dredging) were blackened or dead after the canal was completed.

III
The trial court concluded: "The plaintiffs have failed to carry their burden of proving by the preponderance of the evidence that the activities incident to the exercise of rights under the mineral lease were conducted negligently and without reasonable skill and proper precautions on the part of the defendants in disregard of plaintiffs' rights under their oyster leases."
We agree with the trial judge that plaintiffs did not carry their burden to prove that defendants acted negligently. In order to minimize damages to a co-existent oyster lessee, the burden is placed upon the mineral lessee to conduct its operations with reasonable prudence, and it cannot conduct its operations in disregard of the rights of the oyster lessee. Lauzon v. J.C. Trahan Drilling Contractor, 247 So.2d 236 (La.App. 4th Cir.1971), writ refused, 259 La. 69, 249 So.2d 206 (1971). Should an oyster lessee claim damages from a mineral lessee, the oyster lessee bears the burden of proving that the mineral lessee was negligent or conducted its operations without reasonable prudence and proper precaution. Doucet v. Texas Co., 205 La. 312, 17 So.2d 340 (1944);[4] *659 Voisin v. Berry Bros., Inc., 387 So.2d 633 (La.App. 1st Cir.1980); Captain Kevin Corporation v. Bay Drilling Corporation, 380 So.2d 639 (La.App. 1st Cir.1979); Jurisich v. Louisiana Southern Oil & Gas Co., 284 So.2d 173 (La.App. 4th Cir.1973); Lauzon v. J.C. Trahan Drilling Contractor, supra.
In a negligence action, a finding that the defendant's conduct was a cause in fact of plaintiff's injury, does not by itself establish liability; defendant must also have breached a legal duty imposed to protect plaintiff from the risk involved. See Shelton v. Aetna Casualty & Surety Company, 334 So.2d 406 (La.1976). Defendants' duty as mineral lessee is articulated in the preceding paragraph. Beyond any evidence that defendants' dredging operation may have been a cause in fact of damage to the oysters and water bottoms, plaintiff bore the burden of proving that defendants conducted the operation negligently or without reasonable prudence and proper precaution.
Plaintiffs' evidence does not establish defendants' negligence. There is no showing of a lack of prudence or precaution. To the contrary, the evidence establishes that the defendants carefully surveyed the entire project, considered alternative routes for the canal, selected the route thought to pose the least risk of damage and thereafter performed the project. The evidence does not establish that in performing the project defendants displayed less than ordinary skill, care, and expertise, or utilized unreasonable or imprudent procedures. As to those aspects of the operation which required certain expertise in performance, plaintiffs did not offer evidence of an acceptable standard of expertise against which defendant's performance could be compared. Cf. Sams v. Kendall Const. Co., 499 So.2d 370 (La.App. 4th Cir.1986).
Plaintiffs established that silt overburden damaged the oysters and water bottoms. If defendants' operations contributed to the silt overburden, which may also result from natural phenomena, such a causal connection does not alone establish defendants' liability. The record supports the trial judge's conclusion that plaintiffs did not prove that defendants acted negligently, in disregard of plaintiffs' rights as oyster lessees. We, therefore, will not disturb that conclusion.

IV
In connection with a motion for a new trial plaintiffs raised for the first time the issue of whether La.C.C. Art. 667 has any applicability to this case. The district court denied the motion for a new trial, but did not provide any reasoning concerning Art. 667.
Although the geographic boundaries covered by their respective leases may not be congruent, plaintiffs and defendants are essentially co-lessees of the same property from the same lessor, the State of Louisiana. Both sides exercised separate but co-existing rights to the same property. Plaintiffs could plant, grow and harvest oysters; defendants were allowed to engage in dredging, filling, and local navigation in order to explore, develop or exploit shallow-water areas.
La.C.C. Art. 667 provides that a proprietor may do with his estate whatever he pleases, but what he does should not cause damage to his neighbor. Considering the limited rights granted under their leases, whether plaintiffs or defendants should be considered proprietors is questionable. More important, however, is whether plaintiffs and defendants should be considered neighbors.
We find that as co-existent lessees exercising different but simultaneous rights to the same property granted by the same lessor, plaintiffs and defendants cannot properly be considered neighbors so as to *660 render applicable La.C.C. Art. 667. We hold, therefore, that La.C.C. Art. 667 does not apply as a basis for imposing liability upon defendants in this case.

DECREE
For the reasons assigned we affirm the judgment of the district court.
AFFIRMED.
BARRY, J., dissents with reasons.
BARRY, Judge, dissenting with reasons.
The majority totally discounts the overwhelming expert testimony and misses the logical conclusion that the defendants negligently (almost wantonly) damaged plaintiffs' water bottoms. Four experts testified that several inches of mud from the canal dredging settled on the oyster beds in Wilkinson Bay and killed the oysters. A defense expert agreed. The Wildlife and Fisheries biologist, who investigated the area before and after defendant's dredging operation, found the water bottom overburdened with silt caused by the dredging and the resultant high mortality rate on the oysters. Even Robert Waldron, the defendant who was allowed to testify as an expert (his objectivity is obviously suspect), admitted there was silt buildup and blackened oysters.
I am satisfied the plaintiffs proved by a preponderance of the evidence that the oyster beds were wasted due to the mud overburden from the canal dredging. Plaintiffs' awfully difficult burden of proving causation was carried. The only real question is whether the proof is legally sufficient to permit recovery of damages.[1]
The only Louisiana Supreme Court opinion which considered the rights and duties of owners of co-existing oyster and mineral leases is Doucet v. Texas Co., 205 La. 312, 17 So.2d 340 (1944). There the plaintiff alleged the defendant oil company killed oysters on his leases by discharging waste into and polluting the surrounding lakes. The defendant filed exceptions of no cause and no right of action and argued the oysterman did not possess any right or ownership in the oysters at the time of their death and that the damage was damnum absque injuria since its operation was conducted in the Gulf of Mexico under a state mineral lease.
In discussing the merits of the exceptions (which were overruled by the trial court) the Supreme Court declared that the oysterman had a valuable property right in the oyster beds and could recover against the one by whose fault the loss had incurred. Hence, there was a right of action. The court discussed the legislative intent to permit the state to grant mineral leases without obtaining the oyster lessee's consent:
It was never the legislature's intention to give to the mineral lessees the right to operate or conduct their operations in such a manner as to pollute the waters over these beds and bottoms in utter disregard of the rights of the oyster lessees.
17 So.2d at 341.
On the merits the Supreme Court discussed the defendant's contention that the plaintiff had not carried his burden to prove the discharge actually caused the damage. After a painstaking review of the testimony and evidence the court found the burden of proof had been carried, the oil company's operation was the proximate cause of the oysters' mortality, reversed the judgment and awarded damages.
However, discussion of the oil company's imprudence was sparse and there was no definitive conclusion that the defendant was negligent. The sketchy negligence analysis was spotlighted by Professor Wex S. Malone:
The issue of the wrongfulness of the defendant's conduct was dealt with more sparingly than the other questions of the controversy. The court was satisfied that some of the oil escaped through carelessness on the part of the pumper or gauger, and that leaks developed in *661 the pipes. One might conjecture whether such a case as this really rests upon negligence, or whether the trespassory nature of the invasion, or theories of nuisance, might not be employed if necessary so as to impose an insurer's responsibility.
Malone, The Work of The Louisiana Supreme Court for the 1943-1944 Term: Torts, 6 LA.L.REV. 204, 213 (1945).
The federal courts have repeatedly cited Doucet for the proposition that under Louisiana law the oyster lessee/plaintiff has to prove the defendant negligently or wrongfully exercised its rights under the mineral lease. Collins v. Texas Company, 267 F.2d 257 (5th Cir.1959); Vodopija v. Gulf Refining Co., 198 F.2d 344 (5th Cir.1952); Begovich v. Texas Co., 209 F.Supp. 412 (E.D.La.1962); Vodopija v. Tennessee Gas Trans. Co., 152 F.Supp. 14 (E.D.La.1957).
In Jurisich v. Louisiana Southern Oil & Gas Co., 284 So.2d 173 (La.App. 4th Cir.1973) this court noted that the state appellate opinions either found no damage or clear and blatant wrongful conduct by the defendant oil company. In Skansi v. Humble Oil & Refining Co., 176 So.2d 236 (La.App. 4th Cir.1965) the oysters were contaminated by oil which could not have occurred except for the fault or negligence of the defendant. No damage to the oysters was found in Trosclair v. Superior Oil Co., 219 So.2d 278 (La.App. 1st Cir. 1969). In Lauzon v. J.C. Trahan Drilling Contractor, Inc., 247 So.2d 236 (La.App. 4th Cir.1971), writ refused, 259 La. 69, 249 So.2d 206 (1971), the canal had not been dredged according to the recommended route. In refusing the Lauzon writ, the Supreme Court declared: "On the facts found by the Court of Appeal we find no error of law in the judgment complained of." The Jurisich court disagreed with the federal jurisprudence which declared the tenet to be well-settled law and the majority concluded:
Faced squarely with the issue for the first time, we hold that a mineral lessee is not liable to an oyster lessee of coextensive property for damages resulting from necessary and prudent activities incident to the mineral lease, when the activities are conducted with reasonable skill and with proper precautions. (footnote omitted)
284 So.2d at 178.
Judge Lemmon (now Justice Lemmon), dissented in part in Jurisich and disagreed that the oyster lessee could not recover damages caused willfully though non-negligently by the mineral lessee. The dissent declared:
The mineral lease in this case expressly granted Louisiana Southern the right to dredge canals in connection with its oil exploration. In my opinion the State thereby consented in advance only to reasonable, necessary and skillful dredging and to those changes on the leased premises normally incident to those dredging activities. The phrase `dredging canals' normally denotes the removal of earth, the creation of enlargement of a cavity, and the placement of excavated soil on a spoil bank in proximity to the canal. I do not believe that it is reasonable to infer when a lessor grants the right of `dredging canals' that he thereby consents to any other changes on the leased property or to the damage or destruction of valuable assets, such as oyster beds. These changes and damages are no more normally incident to the dredging of a canal than would be the destruction of crops, buildings or other valuable assets on the leased property.
Therefore, when Louisiana Southern, through its contractor caused damage to the oyster beds within the leased area, a cause of action for recovery of the damage arose in favor of the lessor or its oyster lessee, regardless of the presence or absence of negligence.
284 So.2d at 184.
Subsequent opinions from the First Circuit cited Jurisich and held negligence had to be proven. Voisin v. Berry Bros., Inc., 387 So.2d 633 (La.App. 1st Cir.1980); Captain Kevin Corp. v. Bay Drilling Corp., 380 So.2d 639 (La.App. 1st Cir.1979). Federal opinions added Jurisich to its citation list which included Doucet. See Melancon *662 v. Texaco, Inc., 510 F.Supp. 948 (E.D.La. 1981).
Much has transpired since Doucet, supra (in 1944), at which time the focus was a determination that the oyster lessee had a property right and could recover damages. Recovery seems available only when the oil company's conduct is blatantly lacking in skill and reason and the cause of the damage is attributed to imprudent activityto the exclusion of all other possible causes of oyster mortality. That standard is unreasonable, at best.
Meanwhile, the Louisiana marshland is fast becoming a wasteland as man's technology "advances." It is common knowledge that dredging canals upsets the delicate ecological balance in our valuable bays and marshlands. The vivisection of the coastal area by thousands of miles of pipeline canals continually destroys the marsh. The "spoil levees" left behind unquestionably block the adjacent marsh, restrict necessary overbank flooding, and accelerates the rate of fatal settlement.
It seems to me oyster fishermen must carry an onerous burden to show that an oil company's actions unquestionably caused oyster mortalities on leased oyster beds. Under our jurisprudence the claimant must reconstruct how the operations were accomplished, point out the lack of skill and prudence, and prove those activities destroyed the oyster beds.
If the negligence standard must be utilized to decide culpability, I am satisfied that these plaintiffs proved the dredging operation (by SOLOCO) was unreasonable and imprudent.[2] Mr. Baber hired SOLOCO which used a 4 cubic foot dredge to cut a 40 foot path which created a spoil bank on one side. Then a 30 foot path was cut on its way back which added a spoil bank on the opposite side, leaving about a 75 foot canal blocked in on both sides. At least one of the experts stated the obvious by testifying such a procedure was environmentally unsound and caused additional silt overburden. The canal remained open and was allegedly plugged by McDermott, but there is testimony that the dams at each end are below the water level and inadequate.
It is difficult to believe (as the majority suggests) that damage to these oyster beds would have occurred even if the most feasible route had been chosen, there was prudent dredging and proper backfilling, and the canal properly plugged. The heavy silt overburden and its attendant deadly effect belie a conclusion that the defendants' activities were skillfully and prudently coordinated. Yet the majority point to the fact that plaintiffs did not offer evidence of the acceptable standard of expertise against which defendant's performance could be compared to conclude that they did not prove negligence. Such a position is untenable.
I also find persuasive plaintiff's argument that La.C.C. Art. 667[3] should apply. The majority's conclusion that the oyster and mineral lessees cannot be "neighbors" is not well-founded. It is established that the oyster lessee has a valuable property right in his leased beds. Doucet v. Texas Co., supra. Arguably the oysterman is a proprietor.
Article 667 liability was considered in an oil spill involving damage to oyster beds. In Bianchini v. Humble Pipe Line Company, *663 480 F.2d 251 (5th Cir.1973) plaintiffs argued the defendant oil company's lack of negligence was irrelevant. The U.S. Fifth Circuit noted that "Louisiana law regarding liability for oil pollution is particularly fugacious,"[4] 480 F.2d at 254, but it never had to decide the liability without fault issue. The factfinder had found an intervening cause (an unknown marine vessel ruptured Humble's pipeline) and the oil company not negligent in allowing or failing to prevent the intervention. Strict liability was unavailable under that scenario. The Fifth Circuit left open Article 667's applicability in cases such as here where no intervening cause occurred.
Article 667 imposes strict liability,[5] and the plaintiff need only prove causation in fact by a preponderance of the evidence. Himel v. American Employers Insurance Company, 354 So.2d 606 (La.App. 1st Cir. 1977). The injured party must establish causation between what the defendant did or failed to do and the resultant damage. Patterson v. Garic, 411 So.2d 1091 (La. App. 4th Cir.1982), writ denied 415 So.2d 950 (La.1982). These plaintiffs certainly carried this lighter burden of proof.
The plaintiffs proved, either via negligence or strict liability, that the defendants' dredging caused an unusually heavy, unnatural silt overburden which destroyed their oyster beds. I would reverse and establish a more reasonable standard for recovery.
NOTES
[1] George J. Butler, Inc. and Leo Bianchini were added as plaintiffs in the third supplemental petition. Robert Waldron and Robert Waldron, Inc. were made defendants in the fourth supplemental petition.
[2] Because of the result we reach on the merits we pretermit discussion of prescription and no right of action.
[3] Dr. Hugh Champagne testified that he has not had production on the leases involved since his purchase in 1979 and had himself planted oysters on the leases in 1980 and 1981. He stated he has two lawsuits pending in federal court against Texas Crude, Inc. for damages which allegedly occurred in 1980 to some of the same leases.
[4] The language in Doucet which is relied upon by subsequent opinions does not directly mention the theory of negligence. It states: "It was never the legislature's intention to give to the mineral lessees the right to operate or conduct their operations in such a manner as to pollute the waters over these beds and bottoms in utter disregard of the rights of the oyster lessees." 17 So.2d at 341. Federal opinions subsequently cited Doucet to incorporate negligence into cases involving damage to oyster leases by mineral lessees and the Louisiana circuits eventually used the same test. See the discussion in Jurisich v. Louisiana Southern Oil & Gas Company, supra.
[1] The approximate 3,000 page transcript contains ample evidence to support a substantial award. Unfortunately, the trial was held piecemeal over 18 months, and we are not favored with reasons for judgment.
[2] I do not find merit to the prescription claim. Although Mr. Butler (owner of the leases according to the conveyance office) filed suit before the leases were registered with the Louisiana Department of Wildlife and Fisheries pursuant to La.R.S. 56:425 and 429 (pre-1981 amendment), Mr. Bianchini was subsequently added in an amending petition. That amendment relates back to the filing of the original petition since the claim arose from the same conduct, the defendants were already on notice, their defense would not be prejudiced, and Mr. Bianchini was closely connected in relationship and interest to the original plaintiff, his son-in-law. La.C.C.P. Art. 1153; Giroir v. South Louisiana Medical Center, 475 So.2d 1040 (La.1985); Ray v. Alexandria Mall, 434 So.2d 1083 (La.1983). See also Tate, Amendment of Pleadings in Louisiana, 43 TU.L.REV. 211, 231-38 (1969).
[3] La.C.C. Art. 667 provides:

Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.
[4] "Fugacious" is a good word. Its definition is: of an unsubstantial nature; lasting a short time; evanescent; falling off or disappearing before the usual time; not fixed in a certain place; wandering. Webeter's Third New International Dictionary (1971).
[5] Strict liability is also imposed under La.C.C. Art. 2569. A lessor is similarly held strictly liable for loss suffered by a lessee caused by a vice or defect of the premises when the lessee is not at fault. Negligence need not be proven. Barnes v. Housing Authority of New Orleans, 423 So.2d 750 (La.App. 4th Cir.1982). The dissent in Jurisich v. Louisiana Southern Oil & Gas Co., supra, concluded a cause of action arose after damage to leased oyster beds occurred in favor of the lessor, the State, or its oyster lessee regardless of the absence or presence of negligence.